United States District Court
District of Massachusetts
Western Division

Springfield, Massachusetts

FILED
IN CLERK'S OFFICE

2005 DEC -5 P 3: 40

DISTRICT COURT
DISTRICT OF MASS.

Civil Action No. 05-30082

Scott Stern,                )    Objection to US Magistrate
                            )    Judge Kenneth Neiman's recommendation
              Plaintiff     )    for dismissal
                            )
v                           )
                            )
Mary Jane Stern, et al      )
                            )
              Defendants    )
_____     )

        Now comes plaintiff, Suo moto, upon one's own initiative, sought

to enforce the Constitution of the United States, and the laws of the

United States of America, enacted by their chosen representatives in

the United States Congress, regnat populus, the people rule, which

states, salus populi suprema lex esto, the welfare of the people is the

highest law.  Plaintiff, a natural born citizen, a citizen of ONE OF

the United States, a resident of the Commonwealth of Massachusetts for

thirty-eight years, a free-person, sui juris, of his own right, sought

to enforce his full social, paternal, legal and civil rights accorded

by the United States Constitution and the laws of the United States by

seeking a recourse for wrongs committed by the defendants, that

conspired, under color of state law, to violate the right of privacy of

the plaintiff, and seize his property, his voice, by means of illegally

wiretapping and intercepting conversations, contrary to the laws of the

United States, by use of electronic eavesdropping equipment, between

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

1

the plaintiff and plaintiff's three minor children, to whom the

plaintiff maintains shared legal custody of the three minor children,

contrasting the decision of Newdow, as cited by the Honorable United

States Magistrate Judge, Kenneth P. Neiman.

Jurisdictio est potestas de publico introducta, cum necessitate

juris dicendi.  Jurisdiction is a power introduced for the public good,

on account of the necessity of dispensing justice.  Plaintiff sought

the United States District Court, not to litigate and decide marital

issues relative to plaintiff and defendant's "failed marriage" but

rather, to enforce the rights the United States Congress enacted under,

including, but not limited to, 18 U.S.C. §2510 et seq, and 42 U.S.C.

§1983 and 18 U.S.C. §242, and the Fourth and Fourteenth Amendments.

On April 14, 2005, plaintiff was notified by means of a **NOTICE**

that the above entitled case, previously assigned to Judge Kenneth P.

Neiman, had been tranferred to Judge Michael A. Ponsor for **all further**

**proceedings** (emphasis added)(Appendix A).  Plaintiff had declined the

the assignment of the Honorable Judge Kenneth Neiman and properly

notified the District Court accordingly.  Plaintiff understands the

necessity of using United States Magistrate Judges, such as the

Honorable Kenneth P. Neiman, but respectfully declined the invitation

as such, and plaintiff invokes his Constitutional Right to a Federally

appointed, United States District Court Judge, appointed by the

President of the United States and confirmed by the United States

Congress.

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

Plaintiff hereby objects, in its entirety, the opinions and recommendations of the Honorable Judge Kenneth P. Neiman relative to this civil action.  By stating this objection, in this manner, plaintiff includes all sentences, including case citations, which would negatively effect the outcome and dispostion of the merits of this case.

Not withstanding this, plaintiff hereby invokes his right pursuant to 28 U.S.C. §636 to object to the magistrate's recommendations.

In addition, on page four (4) of the recommendation, there appears to be a footnote enumerated one (1) and no reference at the bottom of the page to this enumerated numerical one (1).  On the bottom of page four (4) there appears to be a footnote enumerated three (3). Either this is a clerical error, or, two footnotes are missing from the recommendation and plaintiff has not been granted the complete recommendation.  For the following reasons, plaintiff hereby submits his objections to this recommendation by the Honorable Judge Kenneth P. Neiman.

### OPINION OF JOHN JOSEPH MOAKLEY, UNITED STATES CONGRESSMAN

"There is no such thing as half justice.  You either have justice or you don't.  You either have democracy in which everyone including the powerful is subject to the rule of law or you don't"

### JURIS PUBLICI & 42 U.S.C. §1983

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

Juris Publici. Of common right. Plaintiff seeks to invoke his common right to equal protection under the laws of the United States of America. Plaintiff has had his federally protected rights violated by the defendants. (Baker v. McCollum, 443 U.S. 137, (1979)). Plaintiff sought, under 42 U.S.C. §1983, to invoke his constitutional rights which states:

"Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory…subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured..."

42 U.S.C. §1983 provides broad and comprehensive relief for civil rights violations and is intended to "ensure that individuals whose federal constitutional or statutory rights are abridged may recover damanges or secure injunctive relief." (Burnett v. Grattan, 468 U.S. 42, 55 (1984)).

42 U.S.C. §1983 does not grant the authority of guardian ad litems, or private citizens, the right to secretly tape conversations, and use them in public or private realms such as court proceedings. The United States Congress enacted code, that, should any conversations be illegally obtained, by means of illegal wiretapping, without proper authority, as designated by the law and code, that such illegal conversations shall be not allowed in any proceeding in any court in

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

the United States, its territories, or possessions.  The Honorable Judge Geoffrey Wilson redacted the illegally obtained recordings by the defendants, of the plaintiff and the three minor children, which were obtained, without his authorization, and without his consent, over the course of eight (8) months during 2004.  The recordings began directly after the appointment of the guardian ad litem, Evan Ehmann, Licsw, was appointed to investigate and report to the court, including visitation between the plaintiff and the three minor children. The guardian ad litem, after being verbally notified by the plaintiff, during interviews with the plaintiff, that plaintiff became knowledgeable and cognizant of the fact that the defendant Mary Jane Stern and Gary Matteson, had engaged in the illegal wiretapping of plaintiff's and the three minor children's telephone conversations, the defendant Evan Ehmann, a state actor, did thereby receive, maliciously and in bad faith, from the defendants Mary Jane Stern and Gary Matteson, illegally obtained recordings and proceeded to publish these recordings in a Report of the Guardian Ad Litem, in the Hampshire Probate and Family Court, in the matter of Stern v. Stern, docket no. 90D0490D1.

Two elements are necessary to state a cause of action under Section 1983:

1) a person must be deprived of a federally protected right
2) the deprivation must occur under color of law (i.e. state action.

(Gomez v. Toledo, 446 U.S. 635, 640 (1980)): (Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970).

In addition, plaintiff, sui juris, in his own right, who brought a claim under Section 1983, need not meet a heightened pleading standard. (Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163 (1993)); (McGrath v. MacDonald, 853 F. Supp. 1 (D.Mass. 1994).

Section 1983 provides a remedy for the deprivation of "rights, privileges, or immunities" guaranteed by the constitution or laws of the United States. (Parratt v. Taylor, 451 U.S. 527 (1981), overruled in part on other grounds by Daniels v. Williams, 474 U.S. 327 (1986)); (Mitchum v. Foster, 407 U.S. 225 (1972)).

No specific intent to deprive a person of a civil right is required to state a cause of action under Section 1983. Monroe v. Pape, 365 U.S. 167 (1961)), overruled on other grounds by Monell v. Social Services of New York, 436 U.S. 658 (1978)).

"A public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." (West v. Atkins, 487 U.S. 42, 50 (1988)). Public employees who enforce unconstitutional laws or ordinances do so under color of law. (Walp v. Corcoran, 454 F.2d 826 (1st Circuit 1972). A person acts under color of law when he or she abuses a state position. (West v. Atkins, 487 U.S. 42, 50 (1988)).

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

While the Honorable Judge Kenneth Neiman relied on Yeo v. Lexington, 131 F. 3d 241, 248-49 (1st Circuit 1997):

"If there is no state action, then the court may not impose constitutional obligations on (and thus restrict the freedom of) private actors."

This argument is incorrect and should be reviewed, de novo, accordingly.

Determining when a "private" party's conduct will be considered "state action," subjecting the party to potential liability under Section 1983, is a very difficult task. If the private party's conduct meets any of the following tests, the state action requirement has been met:

1)  Symbiotic relationship. Edmonson v. Leesville Concrete Co., 500 U.S. 614 (1991); Burton v. Washington Parking Auth., 365 U.S. 715, (1961); Rodriguez v. Furtado, 950 F. 2d 804, 814 (1st Cir. 1991); Rodriguez-Garcia v. Davila, 904 F. 2d 90, 98 (1st Cir. 1990).

2)  Public Function. A function must be historically and traditionally public in nature and within the exclusive prerogative of the state. Jackson v. Metropolitan Edison Co., 419 U.S. 345 (1974); Key v. Drake, 111 F.3d 133 (7th Cir. 1997); Frazier v. Bailey, 957 F. 2d 920 (1st Cir. 1992)(Child abuse investigation is a public function); Malachowski v. City of Keene, 787 F.2d 704,

711 (1st Cir.), cert. denied, 479 U.S. 828 (1986)(child care and placement is not traditionally the exclusive prerogative of the state).

3)   Nexus.   NCAA v. Tarkanian, 488 U.S. 179 (1989); D'Amario v. Providence Civic Ctr. Authority., 783 F. 2d 1 (1st Cir. 1986) (enforcement of the civic center's rules b y employees paid by a private company is state action when the employees are under the control and direction of the civic center).

4)   Joint Participation.  A person may act "under color of law" if "he is a willful participant in joint activity with" the state or its agents.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 152 (1970). A conspiracy with a state actor to violate federally protected rights will subject a private party to Section 1983 liability.  Compare Alexis v. McDonald's Rests. Of Mass. Inc., 67 F.3d 341 (1st Cir. 1995), with Wagenmann v. Adams, 829 F.2d 196 (1st Cir. 1987).

In enacting Section 1983, Congress intended plaintiffs to have immediate access to the federal courts. (Felder v. Casey, 487 U.S. 131, 147 (1988) (citing Patsy v. Board of Regents, 457 U.S. 496 (1982)). See also Talbot v. Lucy Corr Nursing Home, 118 F.3d 215 (4th Cir. 1997)(citing other Circuits position).  Therefore it is unnecessary for

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

a plaintiff to exhaust state administrative remedies before filing suit in federal or state court. (Felder v. Casey, 487 U.S. 131, 147 (1988).

While Section 1983 does not grant subject matter jurisdiction to the federal courts (Cervoni v. Secretary of Health, Educ. & Welfare, 581 F. 2d 1010, 1019 (1st Cir. 1978). The district courts have jurisdiction over actions that arise under federal and constitutional laws pursuant to 28 U.S.C. §§1331 and 1343. Section 1331 provides the district courts with original subject matter jurisdiction of all actions that arise under the constitution, laws or treaties of the United States. It is the basis for most Section 1983 claims. Section 1343 provides the district courts with original subject matter jurisdiction over all actions that arise out of a conspiracy or a violation, under color of law, of a federal law protecting equal rights. The Honorable Judge Kenneth P. Neiman, admitted in his recommendation that plaintiff's complaint did raise federal questions.

State procedural limitations (such as a notice of claim requirements and waiting periods) do not apply to Section 1983 actions. (See Felder v. Casey, 487 U.S. 131, 147 (1988). Applying state procedural requirements to Section 1983 actions in state court would impose a substantive burden and produce a different outcome depending on the forum. Therefore, state procedural limitations do not even apply even when Section 1983 actions are brought in state court. (Felder v. Casey, 487 U.S. at 139).

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

Accordingly, when the defendants conspired to injure this plaintiff's rights accorded under the laws of the United States, they conspired jointly, and the law states:

"When the defendants act together, the law permits the injured party to treat all concerned in the injury jointly." (Hall v. Ochs, 817 F.2d 920, 926 (1st Cir. 1987)(quoting the trial court's jury instruction). Ordinary Tort principles apply in such situations.

The enforcement of Section 1983 rights include rights guaranteed by the Fourth Amendment, including, but not limited to, Unlawful Conviction, Due Process, Eighth Amendment, Equal Protection, and the Fourteenth Amendment secured by the Constitution of the United States.

Plaintiff asserts, maintains, and invokes his rights accorded under the Constitution of the United States for plaintiff's equal protection under the laws of the United States of America.

The Fourth Amendment states:

"The right of the people [plaintiff is one of these people] to be secure in their persons, houses, papers and effects against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Plaintiff's exclusive and private property, his voice, words employed and expressive statements, were directly violated by the defendants herein named by illegally wiretapping telephone

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

conversations between plaintiff and plaintiff's three minor children, plaintiff's three minor children's property, their voices, expressive statements and words employed, were directly violated by the defendants herein named by the defendants illegal, malicious and bad faith actions. In conspiracy, and jointly, with each other, in a deliberate scheme to deprive plaintiff of the "society and companionship" of the three minor children, sought to use plaintiff's recordings in judicial proceedings without plaintiff's knowledge or consent, contrary to the laws of the United States, sound and moral public policy any reasonable person would understand to be repugnant to a civilized society.

"No immunity statute can be enacted by a State that will protect against a federal prosecution" (Jack v. Kansas, 199 U.S. 372, 380; Feldman v. United States, 322 U.S. 487, 491.)

"On August 26, 2005, the United States Attorney Carol C. Lam of the Southern District of California and John C. Richter, Acting Assistant Attorney General for the Criminal Division, U.S. Department of Justice, announced today the indictments of Carlos Enrique Perez-Melara-the creator and marketer of a spyware program called "Loverspy" and four others who used Loverspy illegally to break into the computers and illegally intercept the electronic communications of others...the indictment charges Mr. Perez with: creating a surriptitious interception device, (i.e., the Loverspy program); sending the program, concealed in an innocuous-appearing electronic greeting card, to victims; advertising the program, advertising the surreptitious use of

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

11

the program; *illegal wiretapping; disclosing illegally intercepted communications;* and obtaining unauthorized access to the victim computuers. *Each count of the 35-count indictment carries a maximum penalty of five years in prison and maximum fine of $250,000 per count* (emphasis added)(05CR1264LAB)(See Appendix B-Four pages).

Plaintiff's cause of action against the defendants raises federal questions requiring de novo review by the Honorable Judge Michael A. Ponsor, not withstanding the fact that this case had been re-assigned to the Honorable Judge Michael A. Ponsor on April 14, 2005.

Plaintiff objects, respectfully, to case law cited by the Honorable Judge Kenneth P. Neiman, including but not limited to, Elk Grove Unified School District v. Newdow, 542 U.S. 1, 12-13 (2004)) comparing the lack of rights attempted by Michael Newdow, to be similar and analogous to the plaintiff in this case. The two are not analogous nor mete out the same result. Plaintiff maintains shared legal custody of the three minor children, whom the defendants actively recruited, manipulated, and enrolled, in a scheme to violate the plaintiff's federally protected rights. Michael Newdow, a divorced father, maintains neither shared physical, shared legal, sole physical, or sole legal custody of his minor child, and the court held that Mr. Newdow had "no standing" to maintain a cause of action against Elk Grove Unified School District. Plaintiff maintains standing to sue on behalf of the three minor children, against each of the defendants, or collectively, whether in regard to their rights being violated by the

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

12

defendants, in this civil action, or for other civil actions, should

some unforseen event occurred that required the children's rights to be

protected by means of a lawsuit, federal or state.

The 2005 Federal sentencing guidelines, as of November 1, 2005

state the following:

"3. PRIVACY AND EAVESDROPPING

§2H3.1.    Interception of Communications; Eavesdropping; Disclosure of
Tax Return Information

(a) Base Offense Level (Apply the greater):

(1) 9; or

(2) 6, if the defendant was convicted of 26 U.S.C. § 7213A or 26 U.S.C. § 7216.

(b) Specific Offense Characteristic

(1) If the purpose of the offense was to obtain direct or indirect commercial
advantage or economic gain, increase by 3 levels.

(c) Cross Reference

1) If the purpose of the offense was to facilitate another offense, apply the
guideline applicable to an attempt to commit that other offense, if the
resulting offense level is greater than that determined above.

*Commentary*
*Statutory Provisions: 18 U.S.C. § 2511; 26 U.S.C. §§ 7213(a)(1)-(3), (a)(5), (d), 7213A, 7216; 47
U.S.C. § 605. For additional statutory provision(s), see Appendix A (Statutory Index).
Application Notes:*

*1. Definitions.—For purposes of this guideline, "tax return" and "tax return information" have
the meaning given the terms "return" and "return information" in 26 U.S.C. § 6103(b)(1) and (2),
respectively.*

*2. Satellite Cable Transmissions.—If the offense involved interception of satellite cable
transmissions for purposes of commercial advantage or private financial gain (including
avoiding payment of fees), apply §2B5.3 (Criminal Infringement of Copyright) rather than this
guideline.*

*Background: This section refers to conduct proscribed by 47 U.S.C. § 605 and the Electronic
Communications Privacy Act of 1986, which amends 18 U.S.C. § 2511 and other sections of
Title 18 dealing with unlawful interception and disclosure of communications. These statutes*

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

*proscribe the interception and divulging of wire, oral, radio, and electronic communications. The Electronic Communications Privacy Act of 1986 provides for a maximum term of imprisonment of five years for violations involving most types of communication.(emphasis added)*

§2H3.2. Manufacturing, Distributing, Advertising, or Possessing an Eavesdropping Device

(a) Base Offense Level: **6**

(b) Specific Offense Characteristic

(1) If the offense was committed for pecuniary gain, increase by **3** levels.

*Commentary*

*Statutory Provision: 18 U.S.C. § 2512.*

Historical Note: Effective November 1, 1987.

The 2005 Federal Sentencing Manual indicates that the defendant, Evan Ehmann, who holds not only a position as a "state actor" but a position of public trust, would be subject to:

§3B1.3. Abuse of Position of Trust or Use of Special Skill

If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by **2** levels. This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic. If this adjustment is based upon an abuse of a position of trust, it may be employed in addition to an adjustment under §3B1.1 (Aggravating Role); if this adjustment is based solely on the use of a special skill, it may not be employed in addition to an adjustment under §3B1.1 (Aggravating Role).

*Commentary*

*Application Notes:*

*1. Definition of "Public or Private Trust".—"Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial*

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

14

ed

(c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

*Commentary*

*Application Notes:*

*1. A "participant" is a person who is criminally responsible for the commission of the offense, but need not have been convicted. A person who is not criminally responsible for the commission of the offense (e.g., an undercover law enforcement officer) is not a participant.*
*2. To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants. An upward departure may be warranted, however, in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization.*

*3. In assessing whether an organization is "otherwise extensive," all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive.*

*[Plaintiff's commentary: There are three defendants: Mary Jane Stern, Gary Matteson, and Evan Ehmann. But do the involvement of the Hampshire Probate and Family Court, in attempting to deprive Plaintiff of his constitutional rights to the "society and companionship" of the three minor children, and the "custody, control and maintenance" of the three minor children, a federally protected right, and the denial of prosecution of the three defendants, including, but not limited to, the Northwestern District Attorney's office, the Berkshire District Attorney's office, the United States District Attorney, and the Federal Bureau of Investigation, and the North Adams Police Department, whom the plaintiff individually and personally appealed to for prosecution of the said defendants, for the protection of his constitutionally guaranteed civil rights, accorded by the United States Constitution rights accorded and secured to be, equally protected under the law, prior to, instituting this civil action, sui juris, in his own right, involved other individuals, including this Honorable Court, to deprive this plaintiff the rights accorded by the Constitution, be considered "outsiders"?]*

*4. In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. This adjustment does not apply to a defendant who merely suggests committing the offense.*

*Background: This section provides a range of adjustments to increase the offense level based upon the size of a criminal organization (i.e., the number of participants in the offense) and the degree to which the defendant was responsible for committing the offense. This adjustment is included primarily because of concerns about relative responsibility. However, it is also likely that persons who exercise a supervisory or managerial role in the commission of an offense tend*

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

*to profit more from it and present a greater danger to the public and/or are more likely to recidivate. The Commission's intent is that this adjustment should increase with both the size of the organization and the degree of the defendant's responsibility.*
*In relatively small criminal enterprises that are not otherwise to be considered as extensive in scope or in planning or preparation, the distinction between organization and leadership, and tha of management or supervision, is of less significance than in larger enterprises that tend to have clearly delineated divisions of responsibility. This is reflected in the inclusiveness of §3B1.1(c).*

Historical Note: Effective November 1, 1987. Amended effective November 1, 1991 (see Appendix C, amendment 414); November 1, 1993 (see Appendix C, amendment 500).

## §3B1.2. Mitigating Role

Based on the defendant's role in the offense, decrease the offense level as follows:

(a) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.

(b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels.

In cases falling between (a) and (b), decrease by 3 levels.

*Commentary*

*Application Notes:*

*1. Definition.—For purposes of this guideline, "participant" has the meaning given that term in Application Note 1 of §3B1.1 (Aggravating Role).*

*2. Requirement of Multiple Participants.—This guideline is not applicable unless more than one participant was involved in the offense. See the Introductory Commentary to this Part (Role in the Offense). Accordingly, an adjustment under this guideline may not apply to a defendant who is the only defendant convicted of an offense unless that offense involved other participants in addition to the defendant and the defendant otherwise qualifies for such an adjustment.*

*3. Applicability of Adjustment.—*

*(A) Substantially Less Culpable than Average Participant.—This section provides a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant.*
*A defendant who is accountable under §1B1.3 (Relevant Conduct) only for the conduct in which the defendant personally was involved and who performs a limited function in concerted criminal activity is not precluded from consideration for an adjustment under this guideline. For example, a defendant who is convicted of a drug trafficking offense, whose role in that offense was limited to transporting or storing drugs and who is accountable under §1B1.3 only for the quantity of drugs the defendant personally transported or stored is not precluded from consideration for an adjustment under this guideline.*

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

*(B) Conviction of Significantly Less Serious Offense.—If a defendant has received a lower offense level by virtue of being convicted of an offense significantly less serious than warranted by his actual criminal conduct, a reduction for a mitigating role under this section ordinarily is not warranted because such defendant is not substantially less culpable than a defendant whose only conduct involved the less serious offense. For example, if a defendant whose actual conduct involved a minimal role in the distribution of 25 grams of cocaine (an offense having a Chapter Two offense level of level 14 under §2D1.1 (Unlawful Manufacturing, Importing, Exporting, or Trafficking (Including Possession with Intent to Commit These Offenses); Attempt or Conspiracy)) is convicted of simple possession of cocaine (an offense having a Chapter Two offense level of level 6 under §2D2.1 (Unlawful Possession; Attempt or Conspiracy)), no reduction for a mitigating role is warranted because the defendant is not substantially less culpable than a defendant whose only conduct involved the simple possession of cocaine.*

*(C) Fact-Based Determination.—The determination whether to apply subsection (a) or subsection (b), or an intermediate adjustment, involves a determination that is heavily dependent upon the facts of the particular case. As with any other factual issue, the court, in weighing the totality of the circumstances, is not required to find, based solely on the defendant's bare assertion, that such a role adjustment is warranted.*

## §3B1.3

*4. Minimal Participant.—Subsection (a) applies to a defendant described in Application Note 3(A) who plays a minimal role in concerted activity. It is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group. Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant. It is intended that the downward adjustment for a minimal participant will be used infrequently.*

*5. Minor Participant.— Subsection (b) applies to a defendant described in Application Note 3(A) who is less culpable than most other participants, but whose role could not be described as minimal.*

*6. Application of Role Adjustment in Certain Drug Cases.—In a case in which the court applied §2D1.1 and the defendant's base offense level under that guideline was reduced by operation of the maximum base offense level in §2D1.1(a)(3), the court also shall apply the appropriate adjustment under this guideline.*

Historical Note: Effective November 1, 1987. Amended effective November 1, 1992 (see Appendix C, amendment 456); November 1, 2001 (see Appendix C, amendment 635); November 1, 2002 (see Appendix C, amendment 640).

Furthermore, the defendants, individually, collectively, jointly,

in conspiracy with each other, employed, utilized, entrapped

plaintiff's three minor children to engage in malicious and bad faith

criminal activity known as interception of oral communication, by

coercing the three minor children to deceive their parent for a period

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

of time that exceeded eight (8) months, such use of the three minor

children, the Federal Sentencing Guidelines Manual states the

following:

§3B1.4. Using a Minor To Commit a Crime

**If the defendant used or attempted to use a person less than eighteen years of age to**

**commit the offense or assist in avoiding detection of, or apprehension for, the offense,**

**increase by 2 levels.**

*Commentary*

*Application Notes:*

*1. "Used or attempted to use" includes directing, commanding, encouraging, intimidating, counseling, training, procuring, recruiting, or soliciting.*

*2. Do not apply this adjustment if the Chapter Two offense guideline incorporates this factor.*

*3. If the defendant used or attempted to use more than one person less than eighteen years of age, an upward departure may be warranted.*

Historical Note: Effective November 1, 1995 (see Appendix C, amendment 527). Amended effective November 1, 1996 (see Appendix C, amendment 540). A former §3B1.4 (untitled), effective November 1, 1987, amended effective November 1, 1989 (see Appendix C, amendment 303), was deleted effective November 1, 1995 (see Appendix C, amendment 527).

The three defendants used the three minor children, each of whom

were less than eighteen years of age, and plaintiff, contends, asserts

and advocates that the upward departure of the guidelines is necessary

and mandated by the Sentencing guidelines themselves.

The actions of the three defendants should not be caste aside by

this court as if nothing occurred. Prior to the wanton, reckless,

careless, malicious and bad faith activities of the three defendants,

the plaintiff engaged in the "society and companionship" with the three

minor children, including, but not limited to, telephone conversations,

as much as three times a week, as agreed upon by the defendant and

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

plaintiff in their agreement of the parties in the divorce judgment nisi by the Hampshire Probate and Family Court, with the three minor children, without interference of the illegal activities of the defendants. This activity, by plaintiff, of conversing with the three minor children, is federally protected by the United States Constitution (right of privacy).

Prior to the malicious and bad faith activities of the defendants, plaintiff enjoyed weekly visitation with the three minor children, also a right federally protected by the United States Constitution (Right to expressive association);(right to "society and companionship" of the three minor children, as accorded by the United States Supreme Court, which is regarded as being the Supreme interpreter of the law of the land.

The defendants engaged in illegal wiretapping, a criminal offense, employing plaintiff's three minor children in such a criminal offense.

The defendants, in conspiracy with each other, should be held jointly liable for their egregious, wanton, reckless, malicious and bad faith actions involving the three minor children, against the plaintiff. The defendant Evan Ehmann, after having been verbally notified, by the plaintiff, in personam, against the person [defendant Evan Ehmann] in pleno lumine, a public place, [Plaintiff notified the defendant Evan Ehmann, of the possibility of illegal activity in a McDonald's Restaurant in Greenfield, Massachusetts. The defendant, Evan Ehmann, acknowledged this information from the plaintiff, but, by

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

and because of the defendant's malicious and bad faith motives, the defendant proceeded to receive illegally wiretapped conversations from the defendants Mary Jane Stern and Gary Matteson, at the residence of Gary Matteson; and, in so doing, discussed at length conversations contemporaneously caught in transmission, and, the defendant, Evan Ehmann, upon further hearing the plaintiff question the possibility of being recorded to one of the three minor children, proceeded to continue to engage in writing a report, disclosing the illegally wiretapped conversation(s), in the Report of the Guardian Ad Litem, three pages of which have been redacted by the Honorable Judge Geoffrey Wilson at this time according to the United States Code 18 U.S.C. §§2510-22. Plaintiff states and maintains that the activity of illegally recording conversations is illegal, that the defendants engaged in illegal activity, and the defendant Evan Ehmann, a "state actor" obtained illegal recordings from the defendant Mary Jane Stern and Gary Matteson, maliciously and in bad faith, three pages of text discussing the conversations between the plaintiff and the minor children contrary to the laws of the United States and the law of the Commonwealth of Massachusetts. The defendant Evan Ehmann, under color of state law, attempts to hide under the cloak of "immunity", a creature of the appellate court, a doctrine that is contrary to the laws of the United States and the Constitution of the Commonwealth of Massachusetts.

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

The United States Code 42 U.S.C. §1983, of the United States reads:

"Every person that..."

This include the guardian ad litem, Evan Ehmann, in his malicious and bad faith illegal wiretapping and recording of the plaintiff with the defendant Mary Jane Stern and Gary Matteson contrary to the United States Code 18 U.S.C. §2510 et seq, which states:

**(6) "person" means any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation;** (emphasis added).

18 U.S.C. 2511(1) states:

**"Except as otherwise specifically provided in this chapter any person who—"** (emphasis added).

18 U.S.C. 2511 (1)(a) and (b) state:

"**(a)** intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication;

**(b)** intentionally uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication when—"

Clearly, Congress intended that this statute included "any person" regardless of their position, status or affiliation inside or outside the government. This legislative enactment by the United States Congress, specifies their intent and declaration that "any Objection to Report and Recommendation of U.S. Magistrate Judge KPN

22

person" is inclusive of individuals such as the defendants Evan Ehmann, Licsw, Mary Jane Stern and Gary Matteson.  This includes Evan Ehmann, even as an appointed Guardian Ad Litem for the Hampshire Probate and Family Court, a political subdivision of the Commonwealth of Massachusetts.  The United States Congress also enacted the Electronic Communications Privacy Act of 1986 which further strenghthened the Title III Omnibus Crime Control and Safe Streets Act of 1968.

In the United States Court for the District of Utah, Central Division, the Honorable Paul G. Cassell, in writing the Memorandum Decision denying Motion to Compel under Wiretap Act in the case of United States of America v. Bryan Vance Jones, Case No. 2:04-CR-00510 PGC stated:

"Title III of the Omnibus Crime and Control and Safe Street Act of 1968 (the "Wiretap Act" or the "Act")[1], as amended by the Electronic Communications Privacy Act of 1986 ("ECPA")[2], prohibits the intentional interception and disclosure of any wire, oral, or electronic communications [3]. Unlike the Fourth Amendment[4], the Act applies to not

---

[1] 18 U.S.C. §§2510-22.

[2] Pub. L. No. 99-508, 100 Stat. 1848 (1986).

[3] 18 U.S.C. § 2511(1).

[4] Orin Kerr, The Fourth Amendment and New Technologies: *Constitutional Myths and the Case for Caution*, 102 Mich.L.Rev. 801 (2004).

[5] 18 U.S.C. § 2511(1) (prohibiting "any person").

[6] 18 U.S.C. §2511(1)(a)

[7] 18 U.S.C. §2511(1).

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

only government agents but also to private individuals [5] Here, whether the confidential informant unlawfully intercepted Mr. Jones' private email correspondence is a complicated factual inquiry that is ultimately irrelevant to this motion. In order to prove a violation of the Wiretap Act, Mr. Jones would have to prove that the informant acted *intentionally* [6] and that his email messages were *intercepted* [7] contemporaneous to their transmission.[8]

### Plaintiff's Federal Constitutional Rights & 
### Plaintiff's Equal Protection Under the Law

---

[8] United States v. Councilman, 373 F.3d 197, 201-03 (1st Circuit 2004), reh'g granted, 385 F.3d 793 (holding that copying emails at the server level was not an interception and citing with approval circuit court decisions requiring interception to be contemporaneous with transmission); United States v. Steiger, 318 F.3d 1039, 1048-49 (11th Cir. 2003), cert. denied, 538 U.S. 1051 (2003).

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

In the United States Supreme Court decision of Palmore v. Sidoti, 466 U.S. 429, 104 S.Ct. 1879, 80 L. Ed. 2d 421 (1984), Chief Justice Burger delivered the opinion of the Court:

"The State, of course, has a duty of the highest order to protect the interests of minor children, particularly those of tender years."

Are not the minor children, who have been wrongfully involved and manipulated by the three defendants in criminal, illegal activities, at risk, and in need of the State's, or government's, protection?

Justice Burger continued:

"The goal of granting custody based on the best interests of the child is indisputably a substantial governmental interest for purposes of the Equal Protection Clause"

The fact is, plaintiff, a white male, forty three years old, is being discriminated against by the entities funded to uphold his constitutional rights and to be accorded "equal protection under the law".

The fact is, the defendants violated the rights of the plaintiff, the rights of the three minor children, and this court, with impunity, seeks to quash plaintiff's federally protected right to seek redress for grievances, and accord and grant the defendants with cloaks to prevent them from being prosecuted to the full extent of the law.

In Palmore, Chief Justice Burger stated:

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

"...The constitution cannot control such prejudices but neither can it tolerate them.  Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect."

This is the case of cloaking the actions of the defendants by denying what the United States Congress has already enacted. Government agents and private individuals are liable.  To state they are not, is contradictory to the United States Code, including, but not limited to the Electronic Communications Privacy Act of 1986 which amended Title III of the Omnibus Crime and Control and Safe Street Act of 1968.

Granting immunity to a state actor that violated public law, code and the Constitution of the United States is akin to burning the Constitution itself and expecting society to respect and admire those that burn the constitution to enforce unlawful activities by violating the law itself.

Thurgood Marshall, prior to becoming a United States Supreme Court Justice, in Cooper v. Aaron, 358 U.S. 1 (1958) stated it as such:

"Education is not the teaching of the three R's. Education is the teaching of the overall citizenship, *to learn to live together with fellow citizens, and above all to learn to obey the law*...And, therefore, I am not worried about the Negro children at this stage.  I don't believe they're in this case as such.  I worry about the white children in Little Rock who are told, as young people, that the way to

**get your rights is to violate the law and defy the lawful authorities.**
I'm worried about their future..."

Defendants had no authority by any judicial officer to engage in the illegal wiretapping of the plaintiff and the three minor children. The defendants violated the law, and the lawful authorities by not seeking a warrant, as required by the law, from a judge of competent jurisdiction, prior to engaging in the joint activity of illegally wiretapping the plaintiff and plaintiff's three minor children.

Like Marshall, plaintiff worries over the future of the three minor children. Not merely because of the reality that their mother, the defendant, Mary Jane Stern, has conducted actions which are criminal, and that the defendant conspired with others to engage in malicious and bad faith activities, but because the three minor children are being actively taught that their mother's illegal conduct is accepted and will be protected by society's courts; the three minor children are being pro-actively sent the wrong signal that it's okay to violate the law, at the expense of others, and be guaranteed that no repercussion will occur for such criminal activity. That this court seeks to deny the existence that the plaintiff has been victimized, that the plaintiff, a white male, seeks to enforce the equal protection of the laws, not because the defendant was his "ex-wife" in a "failed marriage" but because the defendant violated the laws of the United States and violated the rights of this plaintiff. The court wishes to utilize the lack of desire to involve itself in "domestic relations",

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

27

and, as Judge Neiman stated in Mendez v. Brown, that this thought is "misplaced".

Plaintiff seeks to enforce his Constitutional rights first and foremost, his federally protected rights, that was the reason for seeking recourse in the United States District Court. To cloak and hide, with impunity, contrary to the law of the United States and the laws of the Commonwealth of Massachusetts, the actions of the defendants is a slap in the face of justice itself. The inscription states "Equal justice under the law." This includes the right of the plaintiff, a victim, to defend his rights under the law. The defendants used the illegal wiretapping of the plaintiff and the three minor children as a means to destroy the relationship between the plaintiff and the three minor children, but also to guarantee a continuation of the status quo for the custody of the three minor children within the purview of the Hampshire Probate and Family Court, and the Commonwealth of Massachusetts, and, with such purview granted, the entitlements granted to parents that maintain a pecuniary interest and financial gain in maintaining custody of a, or several, minor children. This pecuniary interest is also known as Earned Income Tax Credit (EITC). In addition, to this pecuniary benefit, Massachusetts Probate and Family Courts unfairly accord custodial parents, the majority of whom, are women, with an allotment to deduct $20,000 from their earnings, from Child Support Guidelines purposes, and unfairly grant these individuals with an approximate $360,000 entitlement, over the course

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

of eighteen years, thus discriminating against non-custodial parents. The federal government guarantees entitlement to the parent that maintains custody of minor children.  Thus not only did the defendant engage in violating plaintiff's "society and companionship" federally protected right, the defendants conspired with each other to violate plaintiff's "right to privacy", and violated plaintiff's equal protection under the law, by destroying the possibility of the plaintiff from obtaining custody of the three minor childre, to insure that an economic gain would be maintained by insuring the status quo, and prevent the plaintiff from obtaining equal benefits under the law, with equal access to the law.

The Federal Sentencing Guidelines Manual of 2005 state in section §8A1.2 commentary in h, which states:

"*(h) "Pecuniary gain" is derived from 18 U.S.C. § 3571(d) and means the additional before tax profit to the defendant resulting from the relevant conduct of the offense. Gain can result from either additional revenue or cost savings. For example, an offense involving odometer tampering can produce additional revenue. In such a case, the pecuniary gain is the additional revenue received because the automobiles appeared to have less mileage, i.e., the difference between the price received or expected for the automobiles with the apparent mileage and the fair market value of the automobiles with the actual mileage. An offense involving defense procurement fraud related to defective product testing can produce pecuniary gain resulting from cost savings. In such a case, the pecuniary gain is the amount saved because the product was not tested in the required manner.*

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

Equal access to the law is more than the ability to submit a type-written brief, or motion, or complaint, in sui juris, in his own right, it is to provide a economically disadvantaged person, a disabled parent (this plaintiff) the right to obtain legal advice and assistance, pursuant to the Rehabilitation Act and the Americans with Disabilities Act, regardless of his gender; regardless of his parental status; in light of his disability, with the assistance of those governmental organizations that are federally and state funded to protect the rights of individuals, such as that of plaintiff, have had fundamental liberty interests violated by defendants in a conspiracy to violate plaintiff's rights including, but not limited to, right of privacy, illegal wiretapping, and the "society and companionship" with his minor children, search and seizure of his property, under the Fourth and Fourteenth Amendments of the United States.

## STANDARD JURY INSTRUCTIONS FOR CONSPIRACY

Conspiracy is an agreement of two or more people to do something that is unlawful; or to do something by unlawful means; or to use unlawful means. The crime is the agreement to do something unlawful. It does not matter whether the plan was successful or not, or whether any steps were taken to carry out the plan. It is not necessary that the conspirators formulated a formal agreement among themselves, or

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

30

that they agreed on every detail of the conspiracy, or even that they met together.

It is not always possible to prove a conspiracy by direct evidence. The law allows one, where it seems reasonable, to infer that there was a conspiracy from all of the circumstances. For example, if people who know each other or have been in communication with each other are shown to have been involved in concerted actions which all seem designed to accomplish a specific purpose, then it may be reasonable to conclude that those actions were not conincidental but were taken pursuant to a joint plan.

To be liable as a conspirator, the defendant must have actually joined in the conspiracy as something that he or she wished to bring about.

The defendants, in conspiracy with each other, violated plaintiff's fourteenth amendment rights:

"Nor shall any State deprive any person of life, liberty or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

### JUDICIAL IMMUNITY & QUASI JUDICIAL IMMUNITY

The defendant, Evan Ehmann, a state actor, appointed by a judge of the Hampshire Probate and Family Court, denied the plaintiff, plaintiff's property interest, and, in so doing, did such by depriving plaintiff of due process of law, by not seeking proper authority in the form of a search warrant; and a signed written release to engage in

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

wiretapping the conversations of the plaintiff with plaintiff's three minor children.  In essence, the defendants, deprived the plaintiff of his fundamental right to life, liberty and property.

Plaintiff did not bring suit against the guardian ad litem, the defendants, Evan Ehmann, Mary Jane Stern and Gary Matteson for reason of merely being disappointed by the defendant Evan Ehmann inability to provide a resolution to the issue of visitation between father and children, but rather, because plaintiff's rights had been violated by the action of illegally wiretapping plaintiff's conversations without his knowledge and consent, and deprived him of his constitutional rights.  Two entirely different reasons.

"A guardian ad litem must render impartial decisions in cases that excite strong feelings.  Indeed, the need for an "independent" guardian ad litem is particularly compelling in custody disputes. Often parents are pitted against one another in an intensely personal and militant clash.  Innocent children may be pawsn in the conflict. To safeguard the best interests of the children, however, the guardian's judgement must remain impartial (contrast this to Stern by the guardian using illegally recorded conversations handed directly by the defendant Mary Jane Stern, at the residence of the defendant Gary Matteson), unaltered by the intimidating wrath and litigious penchant of disgruntled parents.  Fear of liability to one of the parents can warp judgment that is crucial to vigilant loyalty for what is best for the child; the guardian's focus must not be diverted to appeasement of

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

antagonistic parents." Ward v. San Diego County Department of Social Services, 691 F. Supp.. 238, 240 (S.D. Cal. 1988)

When the defendant, Evan Ehmann, received the illegally wiretapped recording from the defendant Mary Jane Stern, he subjected himself to the "antagonistic" parent Mary Jane Stern, and "appeased" her "warped judgment." Sound public policy demands that the defendants be brought to justice. The defendants should be prosecuted, to the fullest extent of the law, and granted the right to a trial by jury, according to the laws of the United States, for their egregious, malicious and bad faith actions depriving the plaintiff and plaintiff's three minor children of their fundamental constitutional rights.

This right is further enumerated in Article 1 of the Massachusetts Declaration of Rights:

"All people are borne free and equal and have certain natural, essential and unalienable rights; among which may be reckoned the right of enjoying and defending their lives and liberties; that of acquiring, possessing, and protecting property; in fine, that of seeking and obtaining their safety and happiness. Equality uner the law shall not be denied or abridged because of sex, race, color, creed or national origin." Massachusetts Declaration of Rights, art. 1, as amended by art. 106 of the Amendments.

The Federal Sentencing Guidelines Manual, §8A1.2 commentary j state:

*(j) An individual was "willfully ignorant of the offense" if the individual did not investigate the possible occurrence of unlawful conduct despite knowledge of circumstances that*

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

33

*would lead a reasonable person to investigate whether unlawful conduct had occurred.*

The defendant, Evan Ehmann, was "willfully ignorant of the offense" and maliciously, and in bad faith, negligently failed to investigate the possibility that the defendant Mary Jane Stern and Gary Matteson's actions were of unlawful conduct, and, by proceeding to acquire illegally wiretapped conversations of the plaintiff, and the plaintiff's three minor children, did willfully, maliciously and in bad faith, proceed to incorporate illegally obtained recordings contrary to sound public policy and laws of the United States and the law of the Commonwealth of Massachusetts.

It was with contemptuous behavior that the defendant Evan Ehmann utilized illegally wiretapped recordings in his Report of the Guardian Ad Litem of November 29, 2005, three pages of which have been submitted to this court for review and analysis, and these very same pages have been redacted, by the Honorable Judge Geoffrey Wilson, based on the United States Code 18 U.S.C. 2515:

"18 U.S.C. 2515. Prohibition of use as evidence of intercepted wire or oral communications. Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

34

violation of this chapter."




## DE NOVO REVIEW


Plaintff avers to this court to review, de novo, the incorrect recommendation of granting immunity to the defendant Evan Ehmann, in light of the Electronic Communications Privacy Act of 1986 and other amended codes enacted by the United States Congress to protect the plaintiff from criminal activity such as the defendants have committed. Plaintiff avers to this court to review, de novo, the recommendation that the defendants Mary Jane Stern, and Gary Matteson, are not liable and capable of being prosecuted, but rather, in view of the Electronic Communications Privacy Act of 1986 and other amended codes by the United States Congress, that the defendants are to be held accountable for violating the rights of plaintiff and to furthermore protect plaintiff from criminal activity such as the defendants have committed against him.  The factual reason is that the defendants are lawbreakers, and lawbreakers should be punished according to the law. Congress crafted the Electronic Communications Privacy Act of 1986, amending Title III of 1968, so that "any person" could be liable for

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

35

intercepting oral, or wire communications, including that of "government agents" and "private actors" That is the message the United States Congress had envisioned and the court should uphold the law of the land.

What of the future of three minor children? Does this court wish to demonstrate that the right thing to do is to allow the three defendants that violate public policy, the laws and codes of the United States, to not be subjected to the law of the land? Is that the message this court is intending and congress intended to be given to the young people of today, including plaintiff's three minor children?

This plaintiff certainly would think that is not the intended message by this court. It is a sad and unfortunate event that the three minor children's mother committed a crime of illegally wiretapping the plaintiff. It is also sad to note that the children were not only unwitting participants, but that there rights of life, liberty and property were also violated by the defendant, their mother.

Everyday parents are jailed for violating laws, criminal and civil. Some swindle thousands of dollars (Appendix C). Some break a car window and violate their probation (Appendix D). Some are married, some are not. The one thing they have in common is that they have violated the law and have been prosecuted according to society's standards. The defendants are no different. Their crime is no less a crime than those described in Appendix C or Appendix D, or thousands of other lawbreaking citizens within the United States. It is unfortunate

that they have been caught, the laws of the United States must be upheld, and the United States District Court should maintain federal jurisdiction regarding the federal elements of this civil action.

The Honorable Magistrate Judge Kenneth Neiman, in Jeanette Mendez et al, Plaintiff v. Douglas Brown, Acting Commissioner of the Massachusetts Division of Medical Assistance, 311 F.Supp.2d 134(D.Mass.2004) stated:

"In order to seek a redress through §1983...a plaintiff must assert the violation of a federal right, not merely a violation of a federal law." Blessing v. Freestone, 520 U.S. 329, 340 (1997) (emphasis in original). According to the First Circuit Court of Appeals, relative to a recent Medicaid case originatin in this court, "the determination of whether a federal statute creates a private right...turns on Congress's intent." Rolland v. Romney, 318 F.3d 42, 51 (1st Cir. 2003) (citing Alexander v. Sandoval, 532 U.S. 275, 286 (2001), and Middlesex County Sewerage Auth. V. Nat'l Sea Clammers Ass'n, 435 U.S. 1, 13 (1981). "Traditionally," the First Circuit observed, "three indicators" described by the Supreme Court in Blessing help determine whether a particular statutory provision gives rise to an enforceable federal right: (1) whether Congress intended that the provision in question benefit the plaintiff, (2) whether the right assertedly protected by the statute is so vague and amorphous that its enforcement would strain judicial competence; and (3) whether the statute unambiguously imposes a binding obligation on the states. Id at 52 (citing Blessing, 520 U.S.

at 340-341). At bottom, the purpose of a court's inquiry "is to determine whether or not [the] statute 'confer[s] rights on a particular class of persons'" Id. at 51 n.8 (quoting Gonzaga Univ. v. Doe, 536 U.S. 273, 274 (2002)).

Plaintiff objects to the citation that "federal courts have traditionally declined to exercise jurisdiction over matters involving domestic relations." by the Honorable Judge Kenneth P. Neiman, respectfully. (Rago v. Samaraoo, 344 F.Supp.2d 309,314(D.Mass.2004)

The long established principles and doctrines of the Supreme Court of the United States have been integral and definitive regarding the rights of parents.  Plaintiff maintains his paternal, substantive, and legal right to be the father of the three minor children.

The rights of parents to the care, custody and nurture of their children is of such character that it cannot be denied without violating those fundamental principles of liberty and justice which lie at the base of all our civil and political institutions, and such right is a fundamental right protected by this amendment (First) and Amendments 5, 9, and 14. Doe v. Irwin, 441 F Supp 1247; U.S. D.C. of Michigan, (1985).

Parents have a fundamental constitutionally protected interest in continuity of legal bond with their children. Matter of Delaney, 617 P 2d 886, Oklahoma (1980).

The act and actions of the defendants Evan Ehmann, Mary Jane Stern, and Gary Matteson, by and because of their criminal activity,

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

have deprived this plaintiff of his "fundamental constitutionally protected interest in continuity of legal bond with their [his] children."

Parent's interest in custody of her children is a liberty interest which has received considerable constitutional protection; a parent who is deprived of custody of his or her child, even though temporarily, suffers thereby grievous loss and such loss deserves extensive due process protection. In the Interest of Cooper, 621 P 2d 437; 5 Kansas App Div 2d 584, (1980).

Father enjoys the right to associate with his children which is guaranteed by this amendment (First) as incorporated in Amendment 14, or which is embodied in the concept of "liberty" as that word is used in the Due Process Clause of the 14th Amendment and Equal Protection Clause of the 14th Amendment. Mabra v. Schmidt, 356 F Supp 620; DC, WI (1973).

A parent's right to care and companionship of his or her children are so fundamental, as to be guaranteed protection under the First, Ninth, and Fourteenth Amendments of the United States Constitution. In re: J.S. and C., 324 A 2d 90; supra 129 NJ Super, at 489.

The Court stressed, "the parent-child relationship is an important interest that undeniably warrants deference and, absent a powerful countervailing interest, protection." A parent's interest in the companionship, care, custody and management of his or her children rises to a constitutionally secured right, given the centrality of

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

39

family life as the focus for personal meaning and responsibility. Stanley v. Illinois, 405 US 645, 651; 92 S Ct 1208, (1972).

Parent's rights have been recognized as being "essential to the orderly pursuit of happiness by free man." Meyer v. Nebraska, 262 US 390; 43 S Ct 625, (1923).

The U.S. Supreme Court implied that "a (once) married father who is separated or divorced from a mother and is no longer living with his child" could not constitutionally be treated differently from a currently married father living with his child. Quilloin v. Walcott, 98 S Ct 549; 434 US 246, 255^Q56, (1978).

As early as 1994, plaintiff had to seek a court order from the Hampshire Probate and Family Court preventing the defendant Mary Jane Stern from granting his paternal status to a boyfriend and instructing three minor children of tender years to refer to their father by his formal name of "Scott". Honorable First Justice Sean M. Dunphy, now Chief Justice of the Probate and Family Courts, would not have ordered this had the elements not been proven that showed the defendant was engaging in parental alienation of the plaintiff.

Likewise, the elements were proven, by plaintiff, necessitating the redaction of the illegally obtained evidence by the defendant Evan Ehmann, as ordered by the Honorable Judge Geoffrey Wilson. Judge Wilson would have not redacted those pages unless he read the United States Code and believed, to the best of his ability, that the plaintiff's rights had been violated and the illegally wiretapped

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

family life as the focus for personal meaning and responsibility. Stanley v. Illinois, 405 US 645, 651; 92 S Ct 1208, (1972).

Parent's rights have been recognized as being "essential to the orderly pursuit of happiness by free man." Meyer v. Nebraska, 262 US 390; 43 S Ct 625, (1923).

The U.S. Supreme Court implied that "a (once) married father who is separated or divorced from a mother and is no longer living with his child" could not constitutionally be treated differently from a currently married father living with his child. Quilloin v. Walcott, 98 S Ct 549; 434 US 246, 255^Q56, (1978).

As early as 1994, plaintiff had to seek a court order from the Hampshire Probate and Family Court preventing the defendant Mary Jane Stern from granting his paternal status to a boyfriend and instructing three minor children of tender years to refer to their father by his formal name of "Scott". Honorable First Justice Sean M. Dunphy, now Chief Justice of the Probate and Family Courts, would not have ordered this had the elements not been proven that showed the defendant was engaging in parental alienation of the plaintiff.

Likewise, the elements were proven, by plaintiff, necessitating the redaction of the illegally obtained evidence by the defendant Evan Ehmann, as ordered by the Honorable Judge Geoffrey Wilson. Judge Wilson would have not redacted those pages unless he read the United States Code and believed, to the best of his ability, that the plaintiff's rights had been violated and the illegally wiretapped

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

recordings were not admissible. Plaintiff submitted an affidavitt to the Hampshire Probate and Family Court, a copy of which was submitted to the United States District Court. This court should act to uphold the laws protecting the right of this plaintiff. To dismiss this action, is to acknowledge that plaintiff does not have the right to protect his rights, that only government can protect his rights, a government which has openly failed to protect his rights, and expect that plaintiff should not, sui juris, in his own right, seek to remedy the wrongs, through the United States District Court, that the defendants committed against him.

In addition to this affidavitt, plaintiff submitted copies of notes regarding the telephone conversations he had with his three minor children, indicating that the pattern of an unwarranted interference, during telephone conversations with the three minor children, had occurred as early as April of 2004. It was not until one of the minor child's statements alarmed the plaintiff, that the plaintiff sought the assistance of the North Adams Police Department, report and copy of which has been submitted to this court for review.

With all of this evidence, and the four pages from the Guardian Ad Litem's report of November 29, 2004, it seems incredulous that the plaintiff's complaint and evidence had been but merely glossed over and not taken seriously by the Honorable Judge Kenneth P. Neiman.

Recently, an individual before the Honorable Kenneth P. Neiman was arriagned for possessing one photograph of child pornography.

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

41

Plaintiff by no means desires to minimize the negative and heinous criminal activity of those that possess such illegal photographs, but rather, asks this court to explain why the possession of illegally wiretapped telephone conversations, in the possession of the guardian ad litem, Evan Ehmann, and the defendants Mary Jane Stern and Gary Matteson, are any different. Both activities are illegal, are they not? Plaintiff has the right to protect his rights, and, accordingly, seeks to enforce these fundamental rights granted by the Constitution of the United States. Plaintiff's rights have been violated and plaintiff maintains, asserts and invokes all federal rights guaranteed by the United States Constitution and the Laws of the United States. The Codes of the United States are a means to remedy the egregious wrongs and violations perpetrated by the defendants against the plaintiff and plaintiff seeks justice, sui juris, in his own right, for the malicious and bad faith violations of the defendants against plaintiff's life, liberty and property.

No bond is more precious and none should be more zealously protected by the law as the bond between parent and child." Carson v. Elrod, 411 F Supp 645, 649; DC E.D. VA (1976).

A parent's right to the preservation of his relationship with his child derives from the fact that the parent's achievement of a rich and rewarding life is likely to depend significantly on his ability to participate in the rearing of his children. A child's corresponding right to protection from interference in the relationship derives from

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

42

the psychic importance to him of being raised by a loving, responsible, reliable adult. Franz v. U.S., 707 F 2d 582, 595^Q599; US Ct App (1983).

A "responsible" adult is not an adult that utilizes a minor children in an illegal wiretapping scheme against another parent.

A parent that truly is "loving" would not involve their minor children in activity that is unconscionable, immoral and unethical. Clearly, the Court in Franz held that a parent should not interfere with another parent's right to the relationship and rearing of the children, actions that the defendant, by engaging in such criminal activity, precluded plaintiff from participating in the "rearing" of his children, a fundamental liberty interest.

Plaintiff adamantly objects to the recommendation by the Honorable Judge Kenneth P. Neiman that plaintiff Scott Stern is similar to Michael Newdow in Elk Grove Unified School District. Plaintiff maintains his right to shared legal custody and the issue, is not of "domestic relations" as Judge Neiman attempted to express thru the citation of Elk Grove Unified School District v. Newdow. In addition, resulting negligent, bad faith and malicious actions of the defendants deprived the plaintiff of fundamentally protected interests and liberties with plaintiff's three minor children.

The Constitution also protects "the individual interest in avoiding disclosure of personal matters." Federal Courts (and State Courts), under Griswold can protect, under the "life, liberty and

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

pursuit of happiness" phrase of the Declaration of Independence, the right of a man to enjoy the mutual care, company, love and affection of his children, and this cannot be taken away from him without due process of law. There is a family right to privacy which the state cannot invade or it becomes actionable for civil rights damages. Griswold v. Connecticut, 381 US 479, (1965).

The rights of parents to parent-child relationships are recognized and upheld. Fantony v. Fantony, 122 A 2d 593, (1956); Brennan v. Brennan, 454 A 2d 901, (1982). State's power to legislate, adjudicate and administer all aspects of family law, including determinations of custodial; and visitation rights, is subject to scrutiny by federal judiciary within reach of due process and/or equal protection clauses of 14th Amendment...Fourteenth Amendment applied to states through specific rights contained in the first eight amendments of the Constitution which declares fundamental personal rights...Fourteenth Amendment encompasses and applied to states those preexisting fundamental rights recognized by the Ninth Amendment. The Ninth Amendment acknowledged the prior existence of fundamental rights with it: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." The United States Supreme Court in a long line of decisions, has recognized that matters involving marriage, procreation, and the parent-child relationship are among those fundamental "liberty" interests protected by the Constitution. Thus, the decision in Roe v.

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

44

Wade, 410 US 113; 93 S Ct 705; 35 L Ed 2d 147, (1973), was recently described by the Supreme Court as founded on the "Constitutional underpinning of ... a recognition that the "liberty" protected by the Due Process Clause of the 14th Amendment includes not only the freedoms explicitly mentioned in the Bill of Rights, but also a freedom of personal choice in certain matters of marriage and family life." The non-custodial divorced parent has no way to implement the constitutionally protected right to maintain a parental relationship with his child except through visitation. To acknowledge the protected status of the relationship as the majority does, and yet deny protection under Title 42 USC § 1983, to visitation, which is the exclusive means of effecting that right, is to negate the right completely. Wise v. Bravo, 666 F.2d 1328, (1981).

Plaintiff maintains that because the defendants engaged in illegal wiretapping of the plaintiff's conversations with the three minor children, putting a chilling effect on their ability to converse with their father, this plaintiff; it was plaintiff's sole means to encourage the three minor children to continue visitation with the plaintiff, that the defendants violated plaintiff's rights under 42 U.S.C. §1983.

Plaintiff objects to the citation of Yeo v. Town of Lexington, 131 F. 3d 241, 248-49 (1st Cir. 1997) by the Honorable Judge Kenneth P. Neiman. In Yeo, the court held that Kafrissen, an individual named in a

lawsuit, was a "state actor" but for other reasons than the plaintiff Yeo had cited:

"The fact that Kafrissen is a state actor(although not for the reasons Yeo cites), is insufficient to establish state action."

Under the Electronic Communication Privacy Act of 1986, government agents can be held liable for illegally wiretapping and so can private individuals.

The judiciary cannot exclude "state actors" contrary to the Constitution of the United States, and the Constitution of Massachusetts.  They cannot create doctrine, which is created by judicial decisions, and not by law enacted by the United States Congress or the Massachusetts General Court.

The argument Judge Kenneth P. Neiman is presenting is incorrect. In order to be immune, one must be a judge or perform duties like that of a judge.  The guardian ad litem Evan Ehmann, was neither, and certainly the illegal action that gave rise to this civil action is not what a judge does.  Judges, nominated and appointed, are the upholders of the Constitution of the United States and the Massachusetts Constitution.  The Honorable Judge Geoffrey Wilson granted this plaintiff his motion to redact the illegal wiretapped conversations transcribed by the defendant, Evan Ehmann, according to the United States Code.  Judge Wilson applied federal law in the Hampshire Probate and Family Court, a court of the Commonwealth of Massachusetts.  The Report of the Guardian Ad Litem is a document submitted in his court.

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

46

Judge Wilson upheld the Oath and Affirmation he undertook to uphold the Constitution of the United States, and, regardless of the fact that he himself appointed the guardian ad litem, the defendant, he was obligated to abide by the United States Code 18 U.S.C. 2510 et seq. This court should do the same. While it is unfortunate that Evan Ehmann, the defendant, engaged in illegal wiretapping, by and because of the defendants, Mary Jane Stern and Gary Matteson, it was the acceptance of the illegally recorded conversations, from the latter two defendants, that grant this court the right to hold private actors accountable. Likewise a state actor need not be directly hired by the state. The defendants should not be granted immunities merely because the doctrine of immunity is written by judicial doctrine. The immunity must be written into the constitution, or passed by the legislature, and neither of these are applicable to the defendant, Evan Ehmann, or the defendants Mary Jane Stern and Gary Matteson.

Plaintiff avers to this court that the **Fourteenth Amendment added rights including due process and equal protection and stated that any person acting on behalf of any governmental entity must abide by the rights guaranteed by the constitution and it's amendments (state actor) (emphasis added)**.

Wikipedia, the free encyclopedia available on the world wide web defines a state actor as:

"A state actor is a term used in United States civil rights law to describe a person who is acting on behalf of a governmental body,

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

and is therefore subject to regulation under the Fifth and Fourteenth
Amendments, which prohibit the federal and state governments,
respectively, from violating the rights laid out elsewhere in the
Constitution.

Although at first blush the term would seem to include only
persons who are directly employed by the state, the United States
Supreme Court has interpreted these amendments and laws passed pursuant
to them to cover many persons who have only an indirect relationship
with the government.  Controversies have arise, for example, over
whether private companies that run prisons (traditionally a state
function) can be held liable as state actors when they violate the
rights of prisoners.  This question remains unresolved, but with the
Supreme Court has held private citizens to be liable as state actors
when they conspire with government officials to deprive people of their
rights."  Source: http://en.wikipedia.org/wiki/State actor

Plaintiff avers that the defendant Evan Ehmann, a hired
subcontractor of the Hampshire Probate and Family Court, by conducting
investigations relative to custody issues and visitation, as a guardian
ad litem, was not immune to suit, being the fact that the position was
not judicial, but rather investigatory.  Plaintiff submitted to this
honorable court excerpts from the Standards for Category F Guardian Ad
Litem Investigators, by the Commonwealth of Massachusetts, The Trial
Court, Probate and Family Court Department, Honorable Sean M. Dunphy,
Chief Justice, effective January 24, 2005.

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

In these standards, Chief Justice Dunphy clearly states that:

"The role of the Category F GAL investigator is **to gather and report factual information that will assist the court** in making custody, visitation, or other decisions related to the welfare of a child. Unless the appointing judge specifies otherwise, the GAL investigator's role is limited to gathering and reporting information to the court." (emphasis added)

"Commentary: **The court, not the GAL, decides legal issues and ultimately makes credibility determinations and factual findings when facts are in dispute. The GAL reports on facts and avoids providing legal conclusions or legal analysis.**" (emphasis added)

Clearly, the role of the GAL is not the role of a judge. Judges are immune to lawsuits, not GAL's. Plaintiff further avers to this court that the doctrine of "quasi-judicial" immunity is a creature of the courts, and not of the legislature, and has no standing in any court of competent jurisdiction, when reading the Constitution of the United States and the Constitution of Massachusetts and cannot be sustained to prevent prosecution of the defendant, Evan Ehmann.

The 'under color of law' requirement of § 1983 "has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment," United States v. Price, 383 U.S. 787, 794 n. 7 (1966). Indeed, the Supreme Court has reversed an appellate court which treated the two analyses as separate. Lugar v. Edmonson Oil Co., 457 U.S. 922, 924, 928, 929 (1982). This court has consistently treated the

analyses as the same. See Barrios Velazquez v. Asociacion de Empleados, 84 F.3d 487, 490-491 (1st Cir. 1996). Where the statutory and constitutional inquiries are inextricably intertwined, decision of the state action question is hardly a breach of the obligation to decide cases on statutory grounds in order to avoid constitutional questions. We do not engage in a separate § 1983 analysis, nor do we reach the issue of municipal liability, under Monell v. Department of Social Services, 436 U.S. 658 (1978), or of qualified immunity claimed by the individual defendants. The district court ruling did not reach any of these issues. Judge Stahl's concurrence suggests that we leap over the question of state action to address a statutory issue of causation, an unusual approach. The question whether Yeo even has a First Amendment right to assert depends on whether there is state action. The Supreme Court and the circuit court cases described above have consistently addressed the state action question before addressing questions of causation. See also Polk County v. Dodson, 454 U.S. 312, 325 (1981) (examining § 1983 defense of no municipal custom only after examining state action issue). Further, courts ordinarily address questions of jurisdiction first, and the presence of state action is "a jurisdictional requisite for a § 1983 action.

The "search for state action . . . ends by identifying the precise substantive constitutional issue to be addressed." Tribe, American Constitutional Law § 18-6, at 1715 (2d ed. 1988). Plaintiff avers to this court the article by Nahmod, Civil Rights and Civil

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

50

Liberties Litigation: The Law of Section 1983 § 2.04, at 63 (3d ed. 1991)("[S]tate action is not a unitary concept, but varies depending on the constitutional violation asserted.").

Plaintiff also asks this court to see Edmonson v. Leesville Concrete Co., 500 U.S. 614, 619-20 (1991) (discussing the relevance of the "state action" requirement to private freedom.

May it please this court to be reminded of the Massachusetts Constitution, Article V which states:

"All power residing originally in the people, and being derived from them, the several magistrates and officers of government, vested with authority, whether legislative, executive or judicial, are their substitutes and agents, and are at all times accountable to them."

If a judge is accountable to the people, it stands to reason that so would a guardian ad litem be accountable to the people. Plaintiff is one of the people.

Article VI of the Massachusetts Constitution further states:

"No man, nor corporation, or association of men, have any other title to obtain advantages, or particular and exclusive privileges, distinct from those of the community, that what arises from the consideration of services rendered to the public; and this title being in nature neither hereditary, nor transmissible to children, or descendants, or relations by blood, the idea of a man born a magistrate, lawgiver, or judge is absurd and unnatural."

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

51

Clearly, the Constitution of Massachusetts prohibits guardian ad litems from being immune from prosecution, since immunity is a "particular and exclusive privilege" granted to judges in the performance of their duties, and even judges, should they be found to be unethical, immoral, or improper in their service to the community, can be removed, by means of a bill of address in the Commonwealth of Massachusetts as provided by the Constitution of Massachusetts. The process of protecting the "sovereign people" from abuse of power is inherently written into the Constitution of Massachusetts.

In the matter of Novak v. Cobb County Kennestone Hospital Authority, Eleventh Circuit, United States Court of Appeals, No 94-8403 By linking the defendants to the state actor, [Judge Hines], through a conspiracy, counsel apparently believed that they could satisfy the requirements of 42 U.S.C. § 1983 and the Fourteenth Amendment. *See Jones v. Preuit & Mauldin,* 851 F.2d 1321, 1330 (11th Cir.1988) (en banc) (Tjoflat, J., specially concurring) (section 1983 requires proof of an affirmative causal connection between the action taken by the defendant and the constitutional deprivation), *vacated on other grounds,* 489 U.S. 1002 , 109 S.Ct. 1105, 103 L.Ed.2d 170 (1989); *Bendiburg v. Dempsey,* 909 F.2d 463, 468 (11th Cir.1990) (private defendants can be liable under section 1983 if they act in concert with state officials in depriving the plaintiff of constitutional rights), *cert. denied,* 500 U.S. 932 , 111 S.Ct. 2053, 114 L.Ed.2d 459 (1991); *see also Dennis v. Sparks,* <u>449 U.S. 24, 27-29</u> , 101 S.Ct. 183, 186-87, 66 L.Ed.2d 185 (1980) (though a judge may be immune from suit, private

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

52

parties who conspire with him act "under color of state law" for purposes of section 1983).

In no way does this plaintiff attempt to causally connect the Honorable Judge Kenneth P. Neiman as a conspirator. Rather, if substituting the bracketed [Judge Hines], for the defendant Evan Ehmann, it becomes reasonable that the causal connection is evident by reading the entire citations. The proof has been provided to this court. With proper discovery, other evidence may be admitted to further substantiate the egregious, malicious and bad faith motives the defendants undertook to deprive the plaintiff of his fundamental constitutional rights.

In this action, the guardian ad litem wrote of conversations in a report that would not have been written had the defendants Mary Jane Stern and Gary Matteson not illegally seized the conversations of the plaintiff and plaintiff's three minor children. The action of illegally wiretapping the converations caused three minor children to to be deprived of their constitutional right to the "society and companionship" of their parent, this plaintiff. The causal effect is negatively demeaning, demoralizing, to both parent and child; fundamental liberty interest the United Supreme Court has held to be sacred over one hundred and seventy five years of decisions has been violated, by the three defendants. This court has a duty, an obligation, to uphold the decisions of the United States Supreme Court,

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

to uphold the Constitution of the United States, to protect the rights
and liberties of this plaintiff.

The Declaration of Independence said it succinctly:

"We hold these truths to be self-evident, that all men are
created equal, that they are endowed by their Creator with certain
unalienable Rights, that among these are Life, Liberty and the pursuit
of Happiness. That to secure these rights, Governments are instituted
among Men, deriving their just powers from the consent of the governed.
That whenever a Form of Government becomes destructive of these ends,
it is the Right of the People to alter or abolish it, and to institute
new Government, laying its foundation on such principles and organizing
its powers in such form, as to them shall seem most likely to effect
their safety and happiness...but when a long train of abuses and
usurpations, pursuing invariably the same Object evinces a design to
reduce them under absolute Despotism, it is their right, it is their
duty, to throw off such Government, and to provide new Guards for their
future security."

Plaintiff objects to the Honorable Judge Kenneth P. Neiman's
citation of the court case of Cok v. Cosentino, 876 F.2d 1,3 (1st
Circuit 1989) employing immunity to extend to the guardian ad litem.
In this case, the judge is granted immunity, not a guardian ad litem.
This application of Cok is for a judge; a guardian ad litem, is not a
judge.

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

In Mireles v. Waco, the Supreme Court defined the limits of judicial immunity in the following way:

"Accordingly, judicial immunity is not overcome by allegations of bad faith or malice, the existence of which ordinarily cannot be resolved without engaging in discovery and eventual trial."

Pierson v. Ray, 386 U.S. 547, 554, 87 S.Ct. 1213, 1218, 18 L.Ed. 2d 288.

"Rather, our cases make clear that immunity is overcome in only two sets of circumstances. First, a judge is not immune from liability for non-judicial actions, i.e., actions not taken in the judge's judicial capacity,"

Forrester v. White, 484 U.S. at 227-229, 108 S. Ct. at 544-545; Stump v. Sparkman, 435 U.S. at 360, 98 S. Ct. at 1106.

"Second, a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction."

Stump v. Sparkman, 435 U.S. at 356-357, 98 S.Ct. at 1104-1105; Bradley v. Fisher, 80 U.S. at 350-351, 20 L. Ed. 646 (1871). This case does however state that:

"The complaint does not allege facts which, if taken as true, show that the defendants violated "clearly established" statutory or constitutional rights of which a reasonable person would have known." (contrast this to this civil action, the act of illegally wiretapping individuals has a history and has been clearly established and protected by the Courts including the United States Supreme Court and

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

55

the United States Congress) Harlow v. Fitzgerald, 457 U.S. 800, 818; 73
L. Ed. 2d 396, 102 S. Ct. 2727 (1982); See also Castro-Aponte v. Ligia-
Ruberto, etc., et al., 953 F.2d 1429, 1430 (1st Circuit 1992).

In addition, Overton v. Torruella, 183 F. Supp. 2d 295; 2001 U.S.
Dist. Lexis 21895 noted that:

"...judges do not enjoy immunity from criminal liability"
O'Shea v. Littleton, 414 U.S. 488, 503, 38 L. Ed. 2d 674, 94 S.Ct. 669
(1974)

On appeal in United States v Price et al, Nos. 59, 60 Supreme
Court of the United Dates, 383 U.S. 787; 86 S.Ct. 1152; 1966 U.S.; 16
L.Ed. 2d 267, the Supreme Court of the United States reversed the
decision of the District Court. In an opinion by Fortas, J., it was
unanimously held (1) in No. 60 that private individuals were criminally
liable under 242, if they were willful participants in joint activity
with the state or its agents, and (2) in No. 59 that 241 reached
assaults upon rights under the entire Constitution, including rights
under the due process clause.

The Court further held that:

"Within the Congress pressures mounted in the period between the
end of the war and 1870 for drastic measures. A few months after the
ratification of the Thirteenth Amendment on December 6, 1865. Congress,
on April 9, 1866, enacted the Civil Rights Act of 1866, which, as we
have described, included § 242 in its originally narrow form. On June
13, 1866, the Fourteenth Amendment was proposed, and it was ratified in
July 1868. In February 1869 the Fifteenth Amendment was proposed,
Objection to Report and Recommendation of U.S. Magistrate Judge KPN

56

[*805]   and it was ratified in February 1870. On May 31, 1870, the

Enforcement Act of 1870 was enacted.

In this context, it is hardly conceivable that Congress intended

§ 241 to apply only to a narrow and relatively unimportant category of

rights. We cannot doubt that the purpose and effect of § 241 was to

reach assaults upon rights under the entire Constitution, including the

Thirteenth, Fourteenth and Fifteenth Amendments, and not merely under

part of it."

*United States* v. *Classic*, 313 U.S. 299 (right to vote in federal

elections); *Logan* v. *United States*, 144 U.S. 263 (right to be secure

from unauthorized violence while in federal custody); *In re Quarles*,

158 U.S. 532 (right to inform of violations of federal law). Cf. also

*United States* v. *Cruikshank*, 92 U.S. 542, 552; *Hague* v. *CIO*, 307 U.S.

496, 512-513 (opinion of Roberts, J.); *Collins* v. *Hardyman*, 341 U.S.

651, 660.

"[p]rivate persons, jointly engaged with state officials in the

challenged action, are acting `under color' of law for purposes of

Section 1983 actions." Dennis v. Sparks, 449 U.S. 24, 27-28 (1980).

Such joint participation as when a state allows an *ex parte*

attachment, or as here, plaintiff Stern contends, when the state

accepted the tape recording by the defendants, constitutes "a

sufficient nexus between state and individual to demonstrate state

action and permit a §1983 suit against the individual *who* sought the

attachment." *Cf.*Gonzales-Morales v. Hernandez-Arencibia, 221 F.3d 45,

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

57

49 (1st Cir. 2000), citing Lugar, 457 U.S. at 942 ("a private party's joint participation with state officials in the seizure of disputed property is sufficient to characterize that party as a "state actor" for purposes of the Fourteenth Amendment").

The Honorable Judge Kenneth P. Neiman's assessment of the Guardian Ad Litem's role as being "immune" based on the Cok v. Cosentino case was not correct. The question of immunity is not merely if the individual has been appointed by the court, but rather, whether their actions were "at the judge's direction" and whether their action was "judicial" in nature. Clearly, illegal wiretapping the plaintiff, a party in a custody dispute, to the benefit of the other party, is not, a "judicial act." It is reprehensible on its face, and denounced by society's standards.

"In Pulliam v Allen, 456 U.S. 522 (1984), the court held that judicial immunity does not bar an award of attorney fees against a judge when a plaintiff wins a suit against that judge for injunctive or declaratory relief. In Pulliam, the Supreme Court ruled that a magistrate was liable for over $80,000.00 in legal fees and costs because her conduct caused private injury to Plaintiff Allen. The Court held in this fashion even though her actions were indisputably judicial acts within her subject matter jurisdiction. In this case, Magistrate Pulliam set bail for several defendants who were accused of non-jailable offenses. Pulliam, 466 U.S. at 525. When some of the accused individuals were unable to make bail, she ordered them incarcerated.

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

Richmond Allen, one of the bail defendants, sued Magistrate Pulliam for violating his civil rights. Allen did not seek monetary damages; rather he sought injunctive relief to prevent Pulliam from continuing this kind of practice. The first court Allen approached found Pulliam's actions unconstitutional and enjoined her from engaging in such conduct in the future. Allen v Burt, 690 F2d 376, 377 (4th Cir. 1982). Interestingly, this District Court awarded Allen attorney's fees of $7,000.00 under USC §1988. Judge Pulliam appealed the award claiming judicial immunity and the Supreme Court affirmed despite finding that Pulliam had acted in her judicial capacity and within her subject matter jurisdiction. The court held that the doctrine of judicial immunity does not preclude injunctive relief as opposed to money damages against a judicial officer acting in a judicial capacity and, judicial immunity does not preclude a statutory award of attorney's fees generated in obtaining that injunctive relief. After this "death blow" for absolute judicial immunity, numerous efforts have been attempted in the Federal Congress pushed primarily by the American Bar Association to re-institute absolute judicial immunity. All have failed.

Following on Pulliam in 1984, the Court took up Forrester v. White, 44 U.S. 219, 108 S.Ct. 538 (1988). In White a former probation officer filed an action against a state court judge alleging that she was demoted and discharged on account of her sex in violation of the Equal Protection clause of the Fourteenth Amendment. After a jury found

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

in favor of the former probation officer, the District Court for the Southern District of Illinois entered summary judgment for the judge on the grounds of "absolute" judicial immunity. The Court of Appeals for the Seventh Circuit applied the two prong Stump test and logically concluded that the firing of the probation officer was a judicial act within the judge's jurisdiction. 792 F2d 647 (7th Cir. 1986). Following a Writ of Certiorari, the United States Supreme Court unanimously reversed. Writing for the court, Justice O'Connor offered that the court "has generally been quite sparing in its recognition of claims to absolute official immunity" 44 U.S. at 224. Holding that the actions of Judge White in firing Ms. Forrester were not entitled to judicial immunity, the court refused to apply even quasi-judicial immunity. See also, Guercio v Brody, 814 F2d 1115 (1987). Reversing the District and 7th Circuit Court of Appeals, Forrester like Pulliam make it quite clear that absolute judicial immunity is dead in American jurisprudence.

In the Mireles v Waco, 502 US 9, ,112 S. Ct. 286 (1991) opinion, the Court issued a per curiam opinion and disavowed the functional approach articulated in Forrester and returned to the Stump v Sparkman two-pronged judicial act test. As the law stands, there is no "absolute judicial immunity" and our Supreme Court requires the two-prong tests:

1. Does the court have subject matter jurisdiction;

2. Is the act a judicial act.

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

60

Then and only then, according to Mireles (1991) does judicial immunity apply.

It was this very test and the extra-judicial acts of Judge G. Michael Hocking, of Michigan's 56th Circuit Court that led the Federal Court for the western district of Michigan to enter a directed verdict against the judge. In McPherson v Kelsey, et al. U.S. District Court case number 5:93-cv-166, Judge Hocking ordered an attorney jailed for contempt when she argued against his unlawful conduct in a custody and visitation matter. The attorney was literally dragged from the courtroom where deputies beat her. She sustained brain damage from the assault. Her client, the father involved in the visitation dispute protested the action. At one point the Judge ran from the Courtroom, instructed his deputies to seize the father, search him at gunpoint and expel him from the courthouse. The father and attorney filed separate 42 USC § 1983 actions. On June 23rd, 1995 Judge Richard A. Enslen of the U S District Court for the Western District of Michigan entered a directed verdict against Judge Hocking on First, Fourth and Fourteenth Amendment claims and four days later, the jury found against Judge Hocking on these claims and awarded the father money damages (see Appendix E).

Clearly, abrogating their fiduciary and obligatory role as court investigator, by utilizing illegally wiretapped conversations, are not within the purview or assignment of or "at the judge's

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

61

direction." A judge is not going to order, or allow, an appointed guardian ad litem the right to violate the rights of others, unless, according to the law, the individual can prove that the wiretap was a necessary part of an investigatory process, and authorizes, by means of a search warrant, to seize recordings by the individual, pursuant to the United States Code, or the Law of the Commonwealth of Massachusetts. Certainly, the Honorable Judge Geoffrey Wilson, would have not allowed the motion to redact the pages if it was his intent, and "under his direction" to illegally wiretap the plaintiff's conversations with the plaintiff's minor children.

"If "Congress does not act to protect the privacy of our citizens, we may see the gradual erosion of a precious right. Privacy cannot be left to depend solely on physical protection, or it will gradually erode as technology advances." (House Committee on the Judiciary, Electronic Communication Privacy Act of 1986, H.R. Rep. No. 647, 99th Cong., 2d Sess., 22, 19.)

As predicted more than a hundred years ago, "[n]umerous mechanical devices threaten to make good the prediction that 'what is whispered in the closet shall be proclaimed from the housetops." Samuel D. Warren & Louis D. Brandeis, The Right to Privacy, 4 Harvard Law Review 193, 195 (1890)

Privacy is the "right to be let alone" Olmstead v. United States, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting).

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

"It is the principle that protects writings and any other production of the intellect or emotions." Samuel D. Warren & Louis D. Brandeis, The Right to Privacy, 4 Harvard Law Review, 213.

The legislative history of Title III to the Omnibus Crime Control and Safe Streets Act of 1968 (18 U.S.C. §2510-2521 (1996) ("Title III") indicates that a primary purpose of its passage was a concern for privacy interests. See Senate Report No. 1097, 90th Cong., 2d Sess. 66, reprinted in U.S.C.C.A.N. 2112, 2153; S. Rep. No 541, 99th Cong., 2d Sess. 3, 5 (1986), reprinted in 1986 U.S.C.C.A.N. 3555, 3559. See also Gelbard v. United States, 408 U.S. 41, 48 (1972) (stating that protection of privacy was a major concern in congressional passage of Title III); Zweibon v. Mitchell, 606 F.2d 1172, 1182 (D.C. Cir. 1979) (noting that dominant purpose of Title III was to prevent improper privacy invasions), cert. denied, 453 U.S. 912 (1981).

In addition, as noted by the Sixth Circuit, the purpose of Title III "was to sharply curtail electronic surveillance and to authorize it only under strict judicial supervision and authorization." United States v. Jones, 542 F.2d 661 (6th Cir. 1976).

The history of the ECPA also emphasizes the importance of individual privacy as the "primary reason for bringing email, voice-mail, and other forms of communications under the umbrella of Title III. (Thomas R. Greenberg, Email and Voice Mail: Employee Privacy and the Federal Wiretap Statute, 44 Am. U.L. Rev. 219, 252 (1994). "The intent of Congress to take account of privacy concerns is further

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

evidenced by incorporation into the ECPA the Office of Technology

Assessment's most rigorous recommendations respecting…electronic

communications at all phases of transmission and storage, to taking no

action at all." Id at 252, n. 206, citing Office of Technology

Assessment, Federal Government Information Technology: Electronic

Surveillance and Civil Liberties 18, 38 (1985)(noting that Title III

was first major congressional action concerning surveillance and was

drafted to conform with Katz v. United States, 389 U.S. 347 (1967)).

Congress adopted the more stringent of the OTA-proffered options.  See

Pub. L. No. 99-508, 100 Stat. 1848 (codified as amended at 18 U.S.C.

§§2510-2521, 2701-2710, 3121-3126 (1988 & Supp. V 1993)).

While the courts have expanded the doctrine to include

psychiatrists, physicians, therapists and social workers, this

expansion of a judicially created doctrine does not make it correct,

legal or moral.

By contrast, just because the courts have stated it, by employing

"doctrine" and guaranteeing that these "quasi-judicial" officers, whom

have been appointed "arms of the court" and are "an integral part of

the court process" free from liability and "immune" from lawsuit,

guarantees that lawbreakers can violate the social, civil and legal

rights of the people; such as this plaintiff, is not a means to justify

their illegal, egregious, wanton, reckless and immoral behavior

contrary to society's standards.

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

The first significant American adaption of judicial immunity came in 1810, when James Kent authored the New York decision of Yates v Lansing, 5 Jons. 282 (N.Y. Sup. Ct. 1810) Aff'd 9 Jons. 395(N.Y. 1811). In this case, Chancellor John Lansing, Jr. had arrested John Yates for malpractice and contempt. Yates was subsequently set free on a Writ of Habeas Corpus when the New York Supreme Court found the arrest to have been illegal. Chancellor Lansing claimed that the discharge from jail was illegal and imprisoned Yates again. Yates then brought a civil action against Lansing for violation of the Habeas Corpus Act. Chief Justice Kent of the New York Supreme Court held for the Defendant Chancellor on the grounds of judicial immunity. In its decision, Kent first considered the history of judicial immunity and then applied the immunity test set forth by Lord Coke. Realizing that the new American courts did not have the superior and inferior dichotomy of the English courts, Justice Kent adopted the doctrine to fit the American court's system. The Yates decision had a tremendous impact on American jurisprudence and was considered the leading authority on judicial immunity until the Supreme Court addressed the issue in 1868. See e.g. Feinman and Cowen, Suing Judge's: History and Theory, 31 S.C.L.Rev. 201 (1980). In Randall v Brigham, 74 U.S. (7 Wall) 523 (1869) and again in Bradley v Fisher, 80 U.S. (13 Wall) 335 (1872), Mr. Justice Field incorporated the doctrine into American common law.

Thus, the concept of "judicial immunity" came not from the legislative votes of the elected representatives, but rather, from

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

65

"judicial activism" to deprive the people of their rights by granting those in power the ability to abuse their power with impunity and "immunity."

Dr. Robert P. George of the Family Research Council notes the following:

"In 1857, Chief Justice Roger Taney handed down an opinion for the Court in the case of *Dred Scott v. Sandford*. 60 U.S. (19 How.) 393 (1856). That opinion declared even free blacks to be non-citizens and held that Congress was powerless to restrict slavery in the federal territories. It intensified the debate over slavery and dramatically increased the prospects for civil war.

*Dred Scott* was a classic case of judicial activism. With no constitutional warrant, the justices manufactured a right to hold property in slaves that the Constitution nowhere mentioned or could reasonably be read as implying. Of course, the Taney majority depicted their decision as a blow for constitutional rights and individual freedoms. They were protecting the minority (slaveholders) against the tyranny of a moralistic majority who would deprive them of their property rights. Of course, the reality was that the judges were exercising what in a later case would be called "raw judicial power" *Roe v. Wade* 410 U.S. 113, 222 (1973) (Justice Byron White, dissenting). to settle a debate over a divisive moral and social issue in the way they personally favored."

Such is the case of the creature of quasi-judicial and judicial

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

66

immunity.  There are no laws declaring the judiciary or those they appoint to be immune.  Rather, in contrast, it is the judiciary themselves that are claiming this immunity.  The Constitutions do not claim this "doctrine" for them, nor does it state that judges are immune from lawsuit.  The Constitutions do state that the people have the right to remove them from office; we must not forget that the power of the government resides in the people themselves, including that of the judiciary.

Dr Robert George continued:

"It took a civil war and several constitutional amendments (especially the Fourteenth Amendment) made possible by the Union victory to reverse *Dred Scott.*

The *Dred Scott* decision is a horrible blight on the judicial record. We should remember, though, that while it stands as an example of judicial activism in defiance of the Constitution, it is also possible for judges to dishonor the Constitution by refusing to act on its requirements. In the 1896 case of *Plessy v. Ferguson,* 163 U.S. 537 (1896). For example, legally sanctioned racial segregation was upheld by the Supreme Court, despite the Fourteenth Amendment's promise of equality.

In *Plessy,* the justices announced their infamous "separate but equal" doctrine, a doctrine that was a sham from the start. Separate facilities for blacks in the South were then, and had always been, inferior in quality. Indeed, the whole point of segregation was to

embody and reinforce an ideology of white supremacy that was utterly
incompatible with the principles of the Declaration of Independence and
the Fourteenth Amendment. Maintaining a regime of systematic inequality
was the object of segregation. As Justice John Harlan wrote in dissent,
segregation should have been declared unlawful because the Constitution
of the United States is colorblind and recognizes no castes.
*Plessy v. Ferguson*, 163 U.S. 537, 539 (1896) (Justice Harlan,
dissenting).

  A half-century and more passed before the Supreme Court got
around to correcting its error in *Plessy* in the 1954 case of *Brown v.
Board of Education*. 347 U.S. 483 (1954). In the meantime, the Court
repeated the errors that had brought it to shame in the *Dred Scott*
case. The 1905 case of *Lochner v. New York,*  198 U.S. 45 (1905)
concerned a New York law limiting to 60 the number of hours
per week that the owner of a bakery could require or permit his
employees to work. Industrial bakeries are tough places to work, even
now. They were tougher--a lot tougher--then. Workers risked lung
disease from breathing in the flour dust and severe burns from the hot
ovens, especially when they were tired and less than fully alert. The
New York state legislature sought to protect workers against abuse by
limiting their working hours. But the Supreme Court said no.
The justices struck down the law as an unconstitutional interference by
the state in private contractual relations between employers and
employees. The Court justified its action with a story similar to the
one it told in *Dred Scott*. Again, it claimed to be protecting the

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

minority (owners) against the tyranny of the democratic majority. It was restricting government to the sphere of public business and getting it out of private relations between competent adults, namely, owners and workers.

The truth, of course, is that the Court was substituting its own laissez-faire economics philosophy for the contrary judgment of the people of New York, who were acting through their elected representatives in the state legislature. On the controversial moral question of what constituted real freedom and what amounted to exploitation, unelected and democratically unaccountable judges, purporting to act in the name of the Constitution, simply seized decision-making power. *Lochner v. New York*, 54-55 (Justice Holmes, dissenting). This is the standard reading of *Lochner*, shared by contemporary conservatives and liberals alike. For a powerful challenge to the standard reading, and a thoughtful defense of the majority opinion, see Hadley Arkes, "Lochner v. New York and the Cast of Our Laws," in Robert P. George (ed.), *Great Cases in Constitutional Law* (Princeton: Princeton University Press, 2000), ch. 5.

Under the pretext of preventing the majority from imposing its morality on the minority, the Court imposed its own morality on the people of New York and the nation.

Like *Dred Scott*, *Lochner* eventually fell, brought down not by Civil war, but by an enormously popular president fighting a great depression. Under the pressure of Franklin Roosevelt's plan to pack the Supreme Court, the justices, in 1937, repudiated the *Lochner* decision

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

and got out of the business of blocking worker protection and state and federal social welfare legislation. Indeed, the term "Lochnerizing" was invented as a label for judicial rulings that overrode democratic lawmaking authority and imposed upon society the will of unelected judges."

Who are the courts protecting in this civil action?  The lawbreakers or the victim?  At what point does the court realize that the process of protecting the Constitution should not be at the expense of those it is intended to protect.  In other words, in order to uphold the sworn affirmation to protect the Constitution, the Court should not grant immunity to lawbreakers because they have been appointed, not elected, to write reports, conduct evaluations, or give recommendations for the court on various subjects, and conduct their procedures and processes at the expense of their victim's constitutional rights, simply because the Court, a political subdivision of the state, or a governmental department, has appointed someone to investigate issues.

Such as the case at hand, the guardian ad litem, was appointed; however, the guardian ad litem was not appointed, "at a judge's direction" to violate the rights of the plaintiff or plaintiff's three minor children in the process.  Judge Kenneth P. Neiman's recommendation that the guardian ad litem be granted "immunity" based on the Cok v. Cosentino decision denounces the Constitution of the United States and the Constitution of Massachusetts in one fell swoop.

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

70

The Michigan Court of Appeals stated it this way in Bullock v Huster, 532 N.W.2d 202, 209 Mich.App. 551, Bullock as Next Friend of Bullock v. Huster, (Mich.App. 1995),202  209 Mich.App. 551.

The Michigan Court of Appeals heard oral argument on Huster's interlocutory appeal in November of 1994. On April 3rd, 1995 they issued their opinion: No immunity for Guardians ad Litem. The decision caused a stir among court appointed guardians in Michigan. In the Michigan Lawyer's Weekly, these court appointed attorneys whined and complained that now they'd be subject to suit by disgruntled parents. And they'd have no insurance coverage. 9 Mich L. W. 837, April 24, 1995. The response was simple: Bullock is about negligence, not insurance.(See Appendix E, pages 14-16)

The Honorable Judge Fitzgerald concurred and stated:

**"Hence, I would invite the Legislature to revisit the decision to exclude guardians ad litem from the scope of governmental immunity."**

### WHAT IS LAW WITHOUT THE CONSTITUTION?

The Constitution of the United States guarantees the right to redress of grievances.  The Constitution of Massachusetts also guarantees the right to redress of grievances.  Both Constitutions guarantee that individuals have the right to privacy.  Both constitutions guarantee that one should not be subject to unreasonable search and seizure.  If the guardian ad litem, Evan Ehmann is granted immunity, then what is the Constitution if the law is abrogated?  What is law if there is no Constitution to stand behind it?

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

71

What is society to do if justice is blind to the insidious plight against the people's rights?  The Constitution allows the people the right to "abolish it or alter it"!  If the current status quo is maintained, will it take another civil revolution to change the status quo? Or will reason prevail? It did in the reversal of the Dred Scott decision in Plessy, but do individuals, such as plaintiff, whose had his civil rights and liberties violated, have to wait fifty years for the court to protect his rights and liberties?

Plaintiff respectfully objects to the Honorable Judge Kenneth P. Neiman's recommendation to not maintain federal jurisdiction on the state law claims in addition to the federal claims.

Plaintiff brings this suit not only, sui juris, in his own right, but as a "class of one".  To state an equal protection claim based on a class of one, one must allege, as plaintiff has alleged: (1) that "he has been intentionally treated differently from others similarly situated"; and (2) that "there is no rational basis for the difference in treatment or the cause of the differential treatment is a 'totally illegitimate animus' toward the plaintiff by the defendant.

Courts also impose "prudential limitations" on the class of persons who may invoke federal jurisdiction." Massey v. Helman, 196 F 3d. 727, 739 (7th Cir. 1999). For example, generally, "a litigant must assert his own rights and cannot assert the legal rights of a third party." Massey, 196 F.3d at 739.

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

Pursuant to Article III of the United States Constitution, the Court has jurisdiction only over cases or controversies and, thus, "parties seeking to invoke the jurisdiction of federal courts must show that they have standing to sue within the meaning of Article III." Krislov v. Rednour, 226 F 3d 851, 857 (7th Cir. 2000) The minimum standing requirements are: (1) an injury in fact; (2) a causal connection between the injury and the conduct complained of;and (3) a likelihood that the injury would be redressed by a favorable decision. Lujan v Defenders of Wildlife, 504 U.S. 555, 561, 119 L. Ed. 2d 351, 112 S. Ct. 2130 (1992).

An "injury in fact" is "an invasion of a legally protected interest" which is both "concrete and particularized" and "actual or imminent." Lujan, 504 U.S. at 560.

This plaintiff has adequately alleged facts supporting standing. Plaintiff hereby invokes his right to request a de novo review of his supplemental jurisdictional claim under 28 U.S.C. 1367 (a) to seek redress in the federal court pursuant to a de novo review under 28 U.S.C. §636 (b)(1).

Understanding the reluctant of the United States District Court to maintain jurisdiction over the supplemental claims was incorrect. The 5th circuit in Goins decided in the opposite when domestic relation matters are involved, they said:

"However, even when domestic relation matters are involved, a federal court may be a proper forum where the claims arise from

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

73

tortious conduct or out of contract." Goins v. Goins, 777 F.2d 1059, 1061 (5th Cir. 1985).

This is applicable in the matter of Stern v. Stern, this civil action. The defendant Mary Jane Stern violated the judgment of divorce nisi, the agreement of the parties, not only on its face, but by violating the most sacred document Americans hold as "self-evident" and that is the Declaration of Independence and the Articles of Amendments. Not withstanding the fact that the violations violated laws and Code enacted by the United States Congress to enumerate the rights accorded the people of the United States. Plaintiff maintains his right to be accorded the same rights as other people in the United States.

## DISCOVERY REQUEST

Discovery is required to further ascertain to what extent the three defendants, or any other individuals, governmental agencies, political subdivisions, may have fostered, encouraged, directed the conduct of the three defendants to engage in the illegal wiretapping of the plaintiff and plaintiff's three minor children.

## WHAT IS A JUDICIAL ACT?

In reaching its decision in Stump, the court articulated a test to determine what constitutes a judicial act. The court offered:

"The relevant cases demonstrate that the factors determining whether an act by a judge is a "judicial" one relate to the nature of the act itself, i.e., whether it is a function *normally performed by a judge,* and the expectations of the parties, i.e., whether they dealt

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

with the judge in his judicial capacity." *Stump v Sparkman*, 435 U.S. 349, 362 (emphasis added).

## OBJECTION TO DISMISSAL OF CLAIMS

Plaintiff respectfully objects to the Honorable Judge Kenneth P. Neiman's recommendation to dismiss the case without delineating the dismissal with or without prejudice. Plaintiff requested, and prayed, that if the court did not find merit to his federal questions, that in the event of dismissal, that the case would be remanded to the Hampshire Superior Court for further proceedings. Dismissal of the action, carte blanche, of all the defendants would be contrary to sound public policy and deprive the plaintiff of his constitutional right to seek redress in an appropriate and equitable venue for the violations and deprivations plaintiff has sustained by the defendants for their illegal, immoral and unethical actions against his person, property and character, not withstanding the violations of his legal, civil and paternal rights.

Plaintiff submits these aforementioned reasons, case citations and commentary for objecting to the report and recommendation of the Honorable United States Magistrate Judge Kenneth P. Neiman, and asks this court, pursuant to the Federal Rules of Civil Procedure to review, de novo, plaintiff's complaint, arguments, merits and evidence submitted, for its judicious review, in support of plaintiff's constitutional right to privacy; right to be free from unreasonable search and seizure; right to the society and companionship of his three

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

75

minor children; the right to life, liberty and pursuit of happiness as accorded by and under the laws, codes and the Fourth and Fourteenth Amendments of the United States Constitution and the laws and Constitution of the Commonwealth of Massachusetts. These rights include, but are not limited to, the rights accorded by the United Nations General Assembly Resolution 217A (III) of December 10, 1948 of the United Declaration of Human Rights (Appendix F) the Civil Rights Act of 1866 (Appendix G) and 1871 of the United States of America in Congress assembled.

Most humbly and respectfully submitted, this 5 day of December, 2005.

Scott L. Stern

All Rights Reserved without Prejudice

Pro-Se

Plaintiff

400 West Main Street

North Adams, Massachusetts 01247

Objection to Report and Recommendation of U.S. Magistrate Judge KPN

APPENDIX A

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

RE:  Civil / Criminal No.  **3: 05-CV-30082-KPN**

   Title: **SCOTT STERN, V. MARY STERN, ET AL.,**

## NOTICE

Please take notice that the above-entitled case previously assigned to Judge **Kenneth P. Neiman**

has been transferred to Judge **Michael A. Ponsor** for all further proceedings. From this date

forward the number on all pleadings should be followed by the letter (s) **MAP**. In addition,

please ensure that all future correspondence with the Clerk's Office has the proper number and

letter on the lower left hand corner of the envelope, as well on the correspondence or pleading

being filed.

        Thank you for your cooperation in this matter.

                    **SARAH A. THORNTON, CLERK**

                    By: /s/ *Maurice G Lindsay*
                    **Maurice G. Lindsay**
                    **Deputy Clerk**

Date: **April 14, 2005**

Copies to: All Counsel of Record, and Systems Administrator


(6)

APPENDIX B

# *NEWS RELEASE*



## *OFFICE OF THE UNITED STATES ATTORNEY*
## *SOUTHERN DISTRICT OF CALIFORNIA*
### *San Diego, California*

### *United States Attorney*
### *Carol C. Lam*

*For Further Information, Contact: Assistant U. S. Attorney Mitch Dembin, 619-557-5558*

**For Immediate Release**

## NEWS RELEASE SUMMARY - August 26, 2005

United States Attorney Carol C. Lam of the Southern District of California and John C. Richter, Acting Assistant Attorney General for the Criminal Division, U.S. Department of Justice, announced today the indictments of Carlos Enrique Perez-Melara – the creator and marketer of a spyware program called "Loverspy" - and four others who used Loverspy illegally to break into the computers and illegally intercept the electronic communications of others.

According to the indictment, which was returned on July 21, 2005, and recently unsealed, Loverspy was a computer program designed and marketed by Mr. Perez for people to use to spy on others. Prospective purchasers, after paying $89 through a web site in Texas, were electronically redirected to Perez's computers in San Diego, where the "members" area of Loverspy was located. Purchasers would then select from a menu an electronic greeting card to send to up to five different victims or email addresses. The purchaser would draft an email sending the card and use a true or fake email address for the sender. Unbeknownst to the victims, once the email greeting card was opened, Loverspy secretly installed itself on their computer. From that point on, all activities on the computer, including emails sent and received, web sites visited, and

passwords entered were intercepted, collected and sent to the purchaser directly or through Mr. Perez's computers in San Diego. Loverspy also gave the purchaser the ability remotely to control the victim's computer, including accessing, changing and deleting files, and turning on web-enabled cameras connected to the victim computers. Over 1,000 purchasers from the United States and the rest of the world purchased Loverspy and used it against more than 2,000 victims. Mr. Perez's operations were shut down by a federal search warrant executed in October 2003.

The indictment charges Mr. Perez with: creating a surreptitious interception device, (i.e., the Loverspy program); sending the program, concealed in an innocuous-appearing electronic greeting card, to victims; advertising the program; advertising the surreptitious use of the program; illegal wiretapping; disclosing illegally intercepted communications; and obtaining unauthorized access to the victim computers. Each count of the 35-count indictment carries a maximum penalty of five years in prison and a maximum fine of $250,000 per count.

In addition to the indictment of Mr. Perez, the federal grand jury sitting in San Diego handed up separate, two-count indictments charging John J. Gannitto of Laguna Beach, CA; Kevin B. Powell of Long Beach, CA; Laura Selway of Irvine, CA; and, Cheryl Ann Young of Ashland, PA., with illegal computer hacking, through utilization of Loverspy, in furtherance of other criminal activity and with illegally intercepting the electronic communications of their victims. Each of the two counts carries a maximum penalty of up to five years in prison and a maximum fine of up to $250,000.

"This federal indictment – one of the first in the country to target a manufacturer of 'spyware' computer software – is particularly important because of the damage done to people's privacy by these insidious programs," said Acting Assistant Attorney General John C. Richter of the Criminal Division. "Programs such as Loverspy exist solely to latch onto computer equipment for the purpose of stealing personal and financial information. Law enforcement must continue to take action against the manufacturers of these programs to protect unsuspecting victims and seek punishment for those responsible for wreaking havoc online."

2

United States Attorney Carol C. Lam said, "What the promoters of Loverspy didn't know was that while they were watching their victims, law enforcement was watching them."

Daniel R. Dzwilewski, Special Agent in Charge of the San Diego Office of the Federal Bureau of Investigation, stated: "The Internet must remain a safe place for all to enjoy without fear of identity theft and/or loss of privacy and, therefore, the FBI will continue to aggressively pursue those who compromise the privacy of innocent victims through the utilization of 'Spyware'."

Other Loverspy purchasers have been prosecuted by federal authorities in Charlotte, NC; Dallas, TX; and, Honolulu, HI and are being prosecuted in Kansas City, MO and Houston, TX.  U.S. Attorney Lam expressed her appreciation for the continuing support and assistance of the Computer Crime and Intellectual Property Section of the U. S. Department of Justice.  A concerted effort to identify, investigate and prosecute Loverspy purchasers is being conducted by the United States Attorney's Office and Federal Bureau of Investigation in San Diego.    This case was investigated by Special Agents of the San Diego Division of the Federal Bureau of Investigation.  The Loverspy operation was dismantled by the execution of a federal search warrant upon  Perez's residence by the FBI on October 10, 2003.  All known Loverspy victims have been notified by electronic mail that the program was launched against them.

## DEFENDANTS

| | | |
|---|---|---|
| Carlos Enrique Perez-Melara | Location Unknown | Case Number: 05CR1264LAB |
| John J. Gannitto | | Case Number: 05CR1486LAB |
| Kevin B. Powell | | Case Number: 05CR1487LAB |
| Laura F. Selway<br>  aka Laura Shay Selway | | Case Number: 05CR1488LAB |
| Cheryl Ann Young | | Case Number: 05CR1485LAB |

## SUMMARY OF CHARGES

**Charges Against Mr. Perez:**

Count 1:        Manufacturing a Surreptitious Interception Device

3

Title 18, United States Code, Section 2512(1)(b)

Count 2:        Sending a Surreptitious Interception Device
                Title 18, United States Code, Section 2512(1)(a)

Count 3:        Advertising a Surreptitious Interception Device
                Title 18, United States Code, Section 2512(1)(c)(i)

Count 4:        Advertising the Surreptitious Use of an Interception Device
                Title 18, United States Code, Section 2512(1)(c)(ii)

Counts 5-14:    Unlawfully Intercepting Electronic Communications
                Title 18, United States Code, Section 2511(1)(a)

Counts 15-24:   Disclosing Unlawfully Intercepted Electronic Communications
                Title 18, United States Code, Section 2511(1)(c)

Counts 25-35:   Unauthorized Access to Protected Computers for Financial Gain
                Title 18, United States Code, Sections1030(a)(2)(C) and (c)(2)(B)(I)

Each count of the 35-count indictment carries a maximum penalty of five years in prison and a maximum
fine of $250,000 per count.

**Charges Against Mr. Gannitto, Mr. Powell, Ms. Selway and Ms. Young:**

Count 1:        Unauthorized Access to Protected Computers in Furtherance of Other Criminal Offenses
                Title 18, United States Code, Sections1030(a)(2)(C) and (c)(2)(B)(ii)

Count 2:        Unlawfully Intercepting Electronic Communications
                Title 18, United States Code, Section 2511(1)(a)

Each of the two counts carries a maximum penalty of up to five years in prison and a maximum fine of up
to $250,000.

## INVESTIGATING AGENCY

Federal Bureau of Investigation

**An indictment itself is not evidence that the defendants committed the crimes charged. The defendants
are presumed innocent until the Government meets its burden in court of proving guilt beyond a
reasonable doubt.**

4

**Pittsfield:**

**Woman gets 18 months for stealing from boss**

An Adams woman was sentenced to 18 months in the Berkshire House of Correction, 60 days direct, on Tuesday for stealing approximately $30,000 from a North Adams attorney while she worked as his secretary.

Laurene M. Cwalinski, 43, had pleaded guilty in Berkshire Superior Court on Nov. 7 to one count each of larceny over $250 from a person 60 years of age or older. The plea included uttering and forgery, all ongoing and continuing charges.

Judge Daniel A. Ford ordered her to serve 60 days of the 18 month sentence, remain on two years of probation after her release and pay $10,000 in restitution to Attorney Fred T. Thompson.

Cwalinski admitted to stealing the money from Thompson between from Dec. 1, 2002 and Oct. 31, 2003.

# In the Courts

County
Berkshire Eagle

Friday, November 25

**North Adams:**

**Man sentenced for breaking window**

A West Main Street man was sentenced to 90 days in jail yesterday for disorderly conduct charges, and for a violation of probation stemming from assault charges last year.

Craig F. Mancini, 31, was found guilty in Northern Berkshire District Court of malicious destruction of property valued at more than $250 and disorderly conduct.

Judge William P. Hadley sentenced him to 90 days in the Berkshire County House of Correction. He will receive credit for 55 days already served.

The charges stem from an incident in North Adams on July 21, in which he broke the rear window of a car belonging to a former girlfriend.

Mancini was also found to be violation of probation for two charges from 2004 involving the same woman.

In August 2004, he was found guilty of beating her in March of that year. He also admitted to facts sufficient to warrant a guilty finding for beating her the previous January.

— *Christopher Marcisz*

APPENDIX E

# IMMUNITY BROKEN
### ABSTRACT

This article was written to address the immunity claims made by those hired, elected or appointed to serve children in our legal system when they are sued for outrageous acts. This article argues that since the passage of the Child Abuse Prevention and Treatment Act ("The Mondale Act") false claims of child abuse have wrecked havoc on American families. In order to understand the claims for immunity made by doctors, social workers and attorneys who mis-serve children, this article provides a discussion of immunity and its operation in our law. Following a historical overview, this article describes the various claims to immunity from suit made by government officials, prosecutors, law enforcement personnel, guardians, appointed counsel, social workers and various private parties. For the purpose of illustrating how immunity claims may be addressed, this article presents an actual account of a Michigan case concerning issues of Guardian ad Litem immunity. It is the express position of this author that people who chose to aide or represent children must do so competently and professionally or not at all.

## IMMUNITY BROKEN
**Demosthenes Lorandos, Ph.D., J.D.**

Since the passage of the Child Abuse Prevention and Treatment Act ("The Mondale Act") false claims of child abuse have wrecked havoc on American families.

Certainly it is true that children are starved, beaten, raped and killed every day. They deserve protection. The purpose of this article is to address the immunity claims made by those hired, elected or appointed to serve children in our legal system. In order to understand the claims for immunity made by doctors, social workers and attorneys who mis-serve children, this article will begin with a brief discussion of immunity and its operation in our law.

The second part of this article will focus on the various claims to immunity from suit made by government officials, prosecutors, law enforcement personnel, guardians, appointed counsel, social workers and various private parties. The last portion of this work will present an actual account of a ground breaking case being fought through the courts of Michigan on the issue of Guardian ad Litem immunity from suit for negligence, incompetence and intentional torts. It is the express position of this author that people who chose to aide or represent children must do so competently and professionally or not at all.

## A.  JUDICIAL IMMUNITY
### EARLY FORMULATIONS:

The concept of judicial immunity developed in our law from early Anglo-Saxon origins. As Professor Block informs:

> "Under Anglo-Saxon law of the tenth and eleventh centuries, a judgment (doom) could be impeached by charging the official proposing the judgment (the doomsman) with falsehood. This proceeding, known as "forsaking the doom", developed into the complaint of "false judgment", whereby a dissatisfied litigant obtained a writ commanding the challenged court to cause a record of its proceedings to be made and brought before the court of the litigant's superior lord. The complainant could accept the court's record and thus confine the issues to errors of law. But this record could be challenged by anyone willing to engage in physical combat with the champions of the challenged court. If the challenge succeeded, the lower court's judgment was annulled and the court was amerced." Block, Stump v Sparkman and the History of Judicial Immunity, 4980 Duke L.J. 879, 881 (1980).

Displeased with trial by combat, law evolved in England, and in the early 17th century Sir Edward Coke in Floyd and Barker, 77 Eng. Rep. 1305 (Star Chamber 1607), and The Case of the Marshalsea, 77 Eng. Rep. 1027 (Star Chamber 1612), laid out the foundation for the doctrine of judicial immunity. In Barker, Coke established the immunity of a judge "for anything done by him as a judge" 77 Eng. Rep. at 1307. It seems that Judge Barker convicted William Price of murder and sentenced him to death. After the sheriff executed Mr. Price, one Mr. Floyd brought charges against Judge Barker for conspiracy. Sir Edward Coke's decision gave immunity from suit to all of those involved in the prosecution of Price, made it quite clear that Judge Barker's immunity was absolute. In so doing, Coke identified four (4) grounds in public policy for judicial immunity. First, he indicated a necessity for a finality of judgment. Second, Coke offered that immunity is necessary to maintain judicial independence. Third, Coke held for the independence of thought and freedom from manipulation that immunity would provide, and lastly, Coke offered that in order to engender respect and confidence in the judiciary and the government,

immunity for judicial acts was necessary.

Some five years after declaring immunity for judicial acts, Lord Coke modified his doctrine in The Case of the Marshalsea, 77 Eng. Rep. 1027 (Star Chambers 1612). In Marshalsea, Coke set forth a jurisdictional limitation on the doctrine of judicial immunity. For immunity to apply said Coke, not only did the act have to be judicial in nature, but the judge must have had subject matter jurisdiction over the cause for which he acted. In Marshalsea, a judge presiding over a case in assumpsit found against the defendant. This defendant's surety was jailed until the judgment was paid. The surety brought an action against the judge for his imprisonment and the judge defended by claiming immunity. Rejecting the immunity claim, Coke held that the judge had no jurisdiction over actions in assumpsit and thus the proceedings were void. As Coke described it:

"[W]hen a Court has (a) jurisdiction of the cause, and proceeds inverso ordine or erroneously, there the party who sues, or the officer or minister of the Court who executes the precept or process of the Court, no action lies against them. But (b) when the Court has not jurisdiction of the cause, there the whole proceeding is [before a person who is not a judge], and actions will lie against them without any regard of the precept or process..." 77 Eng. Rep. at 1038-41.

Clearly, this laid the foundation for judicial immunity. Coke established requirements for its application, restricting immunity to judicial acts made within the judge's jurisdiction. In addition, he set forth a policy underlying the doctrine: (1) insuring the finality of judgment; (2) protecting judicial independence; (3) avoiding continuous attacks on sincere and conscientious judges; and (4) maintaining respect for the judiciary and the government.

The first significant American adaption of judicial immunity came in 1810, when James Kent authored the New York decision of Yates v Lansing, 5 Jons. 282 (N.Y. Sup. Ct. 1810) Aff'd 9 Jons. 395(N.Y. 1811). In this case, Chancellor John Lansing, Jr. had arrested John Yates for malpractice and contempt. Yates was subsequently set free on a Writ of Habeas Corpus when the New York Supreme Court found the arrest to have been illegal. Chancellor Lansing claimed that the discharge from jail was illegal and imprisoned Yates again. Yates then brought a civil action against Lansing for violation of the Habeas Corpus Act. Chief Justice Kent of the New York Supreme Court held for the Defendant Chancellor on the grounds of judicial immunity. In its decision, Kent first considered the history of judicial immunity and then applied the immunity test set forth by Lord Coke. Realizing that the new American courts did not have the superior and inferior dichotomy of the English courts, Justice Kent adopted the doctrine to fit the American court's system. The Yates decision had a tremendous impact on American jurisprudence and was considered the leading authority on judicial immunity until the Supreme Court addressed the issue in 1868. See e.g. Feinman and Cowen, Suing Judge's: History and Theory, 31 S.C.L.Rev. 201 (1980). In Randall v Brigham, 74 U.S. (7 Wall) 523 (1869) and again in Bradley v Fisher, 80 U.S. (13 Wall) 335 (1872), Mr. Justice Field incorporated the doctrine into American common law.

After more than a century of virtual silence, the doctrine of judicial immunity resurfaced in Stump v Sparkman, 435 U.S. 349 (1978). In this unfortunate case, a mother brought a petition to Judge Stump to have her fifteen year old daughter sterilized. The mother swore that her daughter was promiscuous and that sterilization would be in the best interest of the child. The judge approved the petition in an ExParte proceeding without giving the daughter notice or an opportunity for a hearing. The daughter was told that she was going to undergo an appendectomy and sterilized. Two years after the operation, when married, this woman discovered that she had been sterilized and brought an action against the judge for violating her constitutional rights. Applying the doctrine from Randall v Brigham and Bradley v Fisher, the Supreme Court held that Judge Stump was absolutely immune from a suit for damages. First, the court determined that Judge Stump had subject matter jurisdiction in acting upon the petition. Second, the court determined that Judge Stump's approval of the petition was a judicial act and, therefore, he was protected by the Doctrine of Judicial Immunity. In reaching its decision in Stump, the court articulated a test to determine what constitutes a judicial act. The court offered:

"The relevant cases demonstrate that the factors determining whether an act by a judge is a "judicial" one relate to the nature of the act itself, i.e., whether it is a function *normally performed by a judge*, and the expectations of the parties, i.e., whether they dealt with the judge in his judicial capacity." 435 U.S. 349, 362 (emphasis added)

## *"ABSOLUTE JUDICIAL IMMUNITY" DOES NOT EXIST IN AMERICAN LAW*

In Pulliam v Allen, 456 U.S. 522 (1984), the court held that judicial immunity does not bar an award of attorney fees against a judge when a plaintiff wins a suit against that judge for injunctive or declaratory relief. In Pulliam, the Supreme Court ruled that a magistrate was liable for over $80,000.00 in legal fees and costs because her conduct caused private injury to Plaintiff Allen. The Court held in this fashion even though her actions were indisputably judicial acts within her subject matter jurisdiction. In this case, Magistrate Pulliam set bail for several defendants who were accused of non-jailable offenses.

Pulliam, 466 U.S. at 525. When some of the accused individuals were unable to make bail, she ordered them incarcerated. Richmond Allen, one of the bail defendants, sued Magistrate Pulliam for violating his civil rights. Allen did not seek monetary damages; rather he sought injunctive relief to prevent Pulliam from continuing this kind of practice. The first court Allen approached found Pulliam's actions unconstitutional and enjoined her from engaging in such conduct in the future. Allen v Burt, 690 F2d 376, 377 (4th Cir. 1982). Interestingly, this District Court awarded Allen attorney's fees of $7,000.00 under USC §1988. Judge Pulliam appealed the award claiming judicial immunity and the Supreme Court affirmed despite finding that Pulliam had acted in her judicial capacity and within her subject matter jurisdiction. The court held that the doctrine of judicial immunity does not preclude injunctive relief as opposed to money damages against a judicial officer acting in a judicial capacity and, judicial immunity does not preclude a statutory award of attorney's fees generated in obtaining that injunctive relief. After this "death blow" for absolute judicial immunity, numerous efforts have been attempted in the Federal Congress pushed primarily by the American Bar Association to re-institute absolute judicial immunity. All have failed.

Following on Pulliam in 1984, the Court took up Forrester v White, 44 U.S. 219, 108 S.Ct. 538 (1988). In White a former probation officer filed an action against a state court judge alleging that she was demoted and discharged on account of her sex in violation of the Equal Protection clause of the Fourteenth Amendment. After a jury found in favor of the former probation officer, the District Court for the Southern District of Illinois entered summary judgment for the judge on the grounds of "absolute" judicial immunity. The Court of Appeals for the Seventh Circuit applied the two prong Stump test and logically concluded that the firing of the probation officer was a judicial act within the judge's jurisdiction. 792 F2d 647 (7th Cir. 1986). Following a Writ of Certiorari, the United States Supreme Court unanimously reversed. Writing for the court, Justice O'Connor offered that the court "has generally been quite sparing in its recognition of claims to absolute official immunity" 44 U.S. at 224. Holding that the actions of Judge White in firing Ms. Forrester were not entitled to absolute immunity, the court refused to apply even quasi-judicial immunity. See also, Guercio v Brody, 814 F2d 1115 (1987). Reversing the District and 7th Circuit Court of Appeals, Forrester like Pulliam make it quite clear that absolute judicial immunity is dead in American jurisprudence. In the Mireles v Waco, ___ U.S.___, 112 S. Ct. 286 (1991) opinion, the Court issued a per curiam opinion and disavowed the functional approach articulated in Forrester and returned to the Stump v Sparkman two-pronged judicial act test. As the law stands, there is no "absolute judicial immunity" and our Supreme Court requires the two-prong tests:

1. Does the court have subject matter jurisdiction;
2. Is the act a judicial act.

Then and only then, according to Mireles (1991) does judicial immunity apply.

It was this very test and the extra-judicial acts of Judge G. Michael Hocking, of Michigan's 56th Circuit Court that led the Federal Court for the western district of Michigan to enter a directed verdict against the judge. In McPherson v Kelsey, et al. U.S. District Court case number 5:93-cv-166, Judge Hocking ordered an attorney jailed for contempt when she argued against his unlawful conduct in a custody and visitation matter. The attorney was literally dragged from the courtroom where deputies beat her. She sustained brain damage from the assault. Her client, the father involved in the visitation dispute protested the action. At one point the Judge ran from the Courtroom, instructed his deputies to seize the father, search him at gunpoint and expel him from the courthouse. The father and attorney filed separate 42 USC § 1983 actions. On June 23rd, 1995 Judge Richard A. Enslen of the U S District Court for the Western District of Michigan entered a directed verdict against Judge Hocking on First, Fourth and Fourteenth Amendment claims and four days later, the jury found against Judge Hocking on these claims and awarded the father money damages.

## B. EXTRA-JUDICIAL IMMUNITY CLAIMS
### IMMUNITY CLAIMS CIRCUMSCRIBED BY THE COURT:

Our courts have extended partial immunity for "official and necessary acts" to sheriffs, Doe v McFaul, 599 F.Sup. 1421 (N.D. Ohio 1984); prosecutors Imbler v Pachtman, 424 U.S. 409 (1976); coroners, Lambert v Garlo, 19 Ohio App 3rd 295, 484 NE2d 260 (1985); court reporters, Brown v Charles, 309 F.Supp. 817 (E.D. Wis. 1970); clerks of the court, Wiggins v New Mexico State Supreme Court Clerk, 664 F2d 812 (10th Cir. 1981); jurors, White v Hegerhorst, 418 F2d 894 (9th Cir. 1969); grand jurors, Turpen v Booth, 56 Cal. 65 (1880); witnesses, Briscoe v LaHue, 460 U.S. 325 (1983); bailiffs, Wolf v Flanagan, No. 14746 (Ohio Ct. App. Oct. 2, 1980); and arbitrators, Hill v Aro Corp., 263 F.Sup. 324 (N.D. Ohio 1967).

But the Court has, more often than not, been extremely circumscribed in granting judicial immunity. Indeed, Chief Justice Marshall in the famous Marbury v Madison, 1 Cranch 137 (1803) made it quite clear:

"The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws when he receives an injury." 1 Cranch 137 at 163 (1803).

Indeed, not even the Sergeant-at-Arms of the United States Congress' House of Representatives has been granted immunity. In Kilbourn v Thompson, 103 US 168 (1881):

> "the Sergeant-at-Arms of the House of Representatives arrested the plaintiff under a warrant issued by the House. Plaintiff refused to testify in a congressional investigation and the House issued a contempt citation against him. The court held that the House did not have jurisdiction to conduct the particular investigation. The Sergeant at Arms, therefore, was liable for false arrest and could not assert the issuance of the warrant as a defense."

In Nixon v Herndon, 273 US 536 (1927) the Court held that state officials would be personally liable in damages for denying plaintiff his right to vote by enforcing a racially discriminatory election law. In Monroe v Pape, 365 US 167 (1961) the Supreme Court held that police officers may be held liable under section 1983 for infringing upon the constitutional rights of others even when their actions are not shown to be willful. In Bivens v Six Unknown Named Agents, 304 US 388 (1971) the Court held that in the absence of a federal statutory remedy for unconstitutional searches, the Constitution itself provides for a damage action against the offending federal officers.

Even the Superintendent of Public Documents and the Public Printer for Congress could not sustain an immunity claim when republishing a libel as the Court in Doe v McMillan, 412 U.S. 306 (1972) reasoned, republishing a libel is not an essential part of the legislative process.

Calling the partial immunity granted to many of these officials "qualified immunity", the Court extended common law immunity for "reasonable" acts in "good faith". When lower courts became confused as to whether qualified immunity involved a subjective or objective inquiry, the Court explained in Wood v Strickland, 420 U.S. 328, 95 S. Ct. 992 (1975) that the qualified immunity analysis necessarily contains both objective and subjective elements. The analysis is subjective, said the Court in that the defendant official, to receive protection, must have acted "with a belief that he [was] doing right". Wood, 420 U.S. at 321. The analysis is objective, the Court reasoned, in that officials could not receive protection where they ignorantly believed their actions to be appropriate when in fact their actions violated "settled" and "indisputable" law.

As citizens and their counsel began to utilize 42 USC § 1983 actions to redress grievances, the Court began to articulate its sense of the statute:

> "The purpose of the statute was to deter public officials from using the badge of their authority to violate persons' constitutional rights and to provide compensation and other relief to victims of constitutional deprivations when that deterrence failed." Carey v Piphus, 435 US 247, 253 (1978)

In Gomez v Toledo, 446 U.S. 635 (1979) the Court spoke to the concern among plaintiffs that they had an impossible burden to meet by showing in their pleadings that the acts of the defendants were both unreasonable and in bad faith. The Court offered that "Nothing in the language or legislative history of Sec. 1983, however, suggests that in an action brought against a public official..... a plaintiff must allege bad faith in order to state a claim for relief." Gomez at 640. The Court went on to instruct: "Since qualified immunity is a defense, the burden of pleading it rests with the defendant. See Fed. Rule Civ. Proc. 8© (defendant must plead any "matter constituting an avoidance of affirmative defense")" Id. The Court went on to quote from Wood v Strickland and instructed:

> "The applicable test focuses not only on whether the official has an objectively reasonable basis for that belief, but also on whether "[t]he official himself [is] acting sincerely and with a belief that he is doing right". Gomez, 641

The Court informed that:

> "The existence of a subjective belief will frequently turn on factors which a plaintiff cannot reasonably be expected to know. For example, the official's belief may be based on state or local law, advice of counsel, administrative practice, or some other factor of which the official alone is aware. To impose the pleading burden on the plaintiff would ignore this elementary fact and be contrary to the established practice in analogous areas of the law." Gomez, 641

In City of Newport v Fact Concerts, Inc., 453 US 247.259 (1981) the Court characterized its process of determining the degree of immunity to which a particular official was entitled as a "careful inquiry into considerations of both history and policy."

The same year City of Newport was decided, the Court faced some of the aftermath of the Nixon administration in Harlow et al v Fitzgerald, 457 U.S. 800. In that case, plaintiff Fitzgerald claimed Bryce Harlow and Alexander Butterfield, two Nixon administration aides, conspired to have him discharged from his position with the Air Force. H.R. Haldeman, John Ehrlichman, Ronald Zeigler and Richard Nixon were all heard on the infamous Nixon tapes, discussing Fitzgerald's demise. In their concurrence Mr. Justice Brennan wrote for himself and Justices Marshall and Blackmun and said:

"I agree with the substantive standard announced by the Court today, imposing liability when a public-official defendant "knew or should have known" of the constitutionally violative effect of his actions.... This standard would not allow the official who *actually knows* that he was violating the law to escape liability for his actions, even if he could not "reasonably have been expected" to know what he actually did know.......Thus the clever and unusually well-informed violator of constitutional rights will not evade just punishment for his crimes." Harlow et al v Fitzgerald, 457 U.S. 800, 820-821 (1981) emphasis in original, citations omitted

The Harlow Court reasoned that qualified or "good faith" immunity is an affirmative defense that must be plead by a defendant official. Gomez v Toledo, 446 U.S. 635 (1980). The Court cited to Wood v Strickland, 420 U.S. 308, 322 (1975) and offered: "Decisions of this Court have established that the "good faith" defense has both an "objective" and a "subjective" aspect. The objective element involves a presumptive knowledge of and respect for "basic unquestioned constitutional rights." Harlow et al v Fitzgerald, 457 U.S. 800 (1981)

Several years later, the Court took up the case of Billy Irl Glover. Mr. Glover, a pro se litigant, sued Bruce Tower the Douglas County, Oregon Public Defender and a number of others from his prison cell. Billy Irl alleged that Tower and other conspired to secure a conviction in violation of his constitutional rights. The Federal District Court threw his case out, but the Court of Appeals reversed and the Supreme Court granted certiorari. The Court reasoned:

"We do not have a license to establish immunities from Sec. 1983 actions in the interests of what we judge to be sound public policy. It is for Congress to determine whether Sec. 1983 litigation has become too burdensome to state or federal institutions and, if so, what remedial action is appropriate." Tower v Glover, 104 S. Ct. 2820, 2826 (1984)

That being said, the Court reviewed its immunity decisions and the history of the Civil Rights Act of 1871 [also known as the Klu Klux Klan Act]. Quoting from Imbler v Pachtman, 424 US 409 at 421 (1976), the Court noted that § 1983 immunities are "predicated upon a considered inquiry into the immunity historically accorded the relevant official at common law and the interests behind it." If an official was accorded immunity from tort actions at common law when the Civil Rights Act was enacted in 1871, the Court offered that it next considers whether Civil Rights Act history or purposes nonetheless counsel against recognizing the same immunity in § 1983 actions. In Tower, the Court concluded: "Using this framework we conclude that public defenders have no immunity from § 1983 liability for intentional misconduct of the type alleged here."Tower v Glover, 104 S. Ct. 2820, 2825 (1984).

The following year the Court took up more of the Nixon administration backwash in Mitchell v Forsyth, 472 U.S. 511(1985) and reasoned: "The danger that high federal officials will disregard constitutional rights in their zeal to protect the national security is sufficiently real to counsel against affording such officials an absolute immunity." Mitchell at 523.

Two years later, the Federal Court of Appeals for the Ninth Circuit reviewed the Supreme Court's partial immunity decisions and reasoned: "In spite of the benefits of immunity for certain decision makers, the balance might not be struck in favor of absolute immunity were it not for the presence of safeguards build into the judicial process that tend to reduce the need for private damage action." Meyers v Contra Costa Cy. Dep't of Social Servs., 812 F2d 1154, 1158 (9th Cir. 1987). The following year, the Eleventh Circuit took up Goddard v Urrea, 847 F2d 765 (11th Cir. 1988). In Goddard the plaintiff brought a civil suit claiming that the defendants, agents of the Bureau of Alcohol, Tobacco and Firearms, had conducted an unlawful search and seizure of her property. The defendants filed a motion for summary judgment, claiming qualified immunity. The district court denied the motion and the defendants appealed. The Eleventh Circuit held that the denial of summary judgment for qualified immunity was justified because genuine issues of fact remained, which would impact upon a finding of good faith or reasonableness. The same year, the Sixth Circuit rejected a plea to dismiss because of "qualified immunity" and declared it an "affirmative defense" which the defendant had to plead and prove. Duncan v Peck, 844 F2d 1261 (1988).

A year after Duncan, the Sixth Circuit took up the claims of James and Grace Achterhof. Their cause of action against social worker Anthony Selvaggio and his Department of Social Services were dismissed when the District Court ruled that the defendants were entitled to "absolute immunity" for their actions in "opening a case" on the Achterhof's children and placing Mr. Achterhof's name on a central registry of child abusers even after their investigation found no credible evidence of abuse. The Sixth Circuit reversed reasoning that because of the sweep of absolute immunity, and reluctance of the Supreme

Court to extend "absolute" prosecutorial or judicial immunity to anyone but prosecutors and judges, it was inappropriate to extend a prosecutor's or judge's immunity to investigative social workers. Achterhof v Selvaggio, 886 F2d 826, 829 (6th Cir. 1989).

The Court made explicit its wish to circumscribe immunity claims recently in Antoine v Beyers & Anderson, Inc. ___ U.S.___, ___ n4, 113 S. Ct. 2167, 2170 N4 (1993), saying that the courts have "been quite sparing in [their] recognition of absolute immunity and have refused to extend it any further than its justification would warrant".

## LEGISLATIVE & QUASI-GOVERNMENTAL OFFICIALS and IMMUNITY

Aside from the historical interest the Nixon tapes provide, Harlow et al v Fitzgerald, 457 U.S. 800 (1981) found the United States Supreme Court ruling that public policy does not require a blanket recognition of "absolute" immunity for Presidential aides. Examining the plea of Bryce Harlow and Alexander Butterfield for "absolute immunity" the Harlow Court reasoned:

"In order to establish entitlement to absolute immunity a Presidential aide first must show that the responsibilities of his office embraced a function so sensitive as to require a total shield from liability. He then must demonstrate that he was discharging the protected function when performing the act for which liability is asserted." Harlow, 457 U.S. 800, 812-813 (1981)

The Court went on to suggest that the "special functions" rationale Harlow and Butterfield put forth did not warrant a blanket recognition of "absolute" immunity for all presidential aides in the performance of their duties. The Court reasoned that this conclusion follows from their decision in Butz, which established that an executive official's claim to "absolute" immunity must be justified by reference to the public interest in what they termed "the special functions of his office, not the mere fact of high station." Harlow et al v Fitzgerald, 457 U.S. 800, 812 (1981). The Court examined its "subjective" and "objective" proofs for immunity articulated in Wood v Strickland, 420 U.S. 308, 322 as a "subjective" aspect of qualified or "good faith" immunity—whereby such immunity is not available if the official asserting the defense "took the action with the malicious intention to cause a deprivation of constitutional rights or other injury," and determined that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow et al v Fitzgerald, 457 U.S. 800, 818 (1981).

In Harlow, the Court made clear that "a reasonably competent public official should know the law governing his conduct." Harlow, 457 U.S. 819. The Court instructed the judiciary that:

"On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful. ......If the law was clearly established, the immunity defense ordinarily should fail." Harlow et al v Fitzgerald, 457 U.S. 800, 818 (1981)

The Nixon administration also gave us Mitchell v Forsyth, 472 U.S. 511 (1985) In Mitchell, Attorney General John Mitchell ordered Haverford College physics professor William Davidon's telephone conversations on professor Davidon's line illegally taped. When Keith Forsyth, a party to several "innocuous" telephone conversations on professor Davidon's line discovered the tap, he filed suit. Mitchell, 472 U.S. 51, 513 Mitchell and a legion of Deputy Solicitor Generals and Acting Assistant Attorney Generals claimed "absolute" immunity. The Court noted the findings of the District Court that:

"Mitchell and the Justice Department, the court suggested, had chosen to "gamble" on the possibility that this Court would create an exception to the warrant requirement if presented with a case involving national security. Having lost the gamble, Mitchell was not entitled to complain of the consequences." Mitchell v Forsyth, 472 U.S. 511, 517 (1985)

In the Court's analysis, Mr. Justice White informed that merely Mitchell's status as a Cabinet officer "is not in itself sufficient to invest him with absolute immunity..." Mitchell 472 U.S. at 521. The Court went on to succinctly conclude:

"the Attorney General is not absolutely immune from suit for damages arising out of his allegedly unconstitutional conduct in performing his national security functions." Mitchell v Forsyth, 472 U.S. 511, 520 (1985)

The claims of Legislators to "absolute" immunity have not done better. In Gravel v United States, 408 U.S. 606 (1972) the Court held that neither absolute nor qualified immunity can be relied upon to protect interference with the criminal process or grand jury investigations. In Doe v McMillan, 412 U.S. 306 (1973) the Court held that:

> "for purposes of the Judacially fashioned doctrine of immunity, the Public Printer and Superintendent of Documents are no more free from suit in [republishing a libel], than would be a legislative aide who made copies of material at issue and distributed them to the public at the direction of his superiors."
> Doe v McMillan, 412 U.S. 306, 324 (1973)

Considering the Speech and Debate Clause and its previous decisions with respect to legislators, the Court in Hutchinson v Proxmire, 443 U.S. 111 (1978) cited to United States v Johnson, 383 U.S. 169 (1969) and offered:

> "...In its narrowest scope , the Clause is a very large, albeit essential, grant of privilege. It has enabled reckless men to slander [by speech or debate] and even destroy others with impunity, but that was the conscious choice of the Framers.' 408 U.S., at 516.....We are unable to discern any "conscious choice" to grant immunity for defamatory statements scattered far and wide by mail, press, and the electronic media." Hutchinson v Proxmire, 443 U.S. 111, 131-132

In Chastain v Sundquist, 833 F2d 311 (D.C. Cir 1987) Tennessee Congressman Don Sundquist libeled attorney Wayne Chastain in a letter to Attorney General William French Smith. When Chastain filed suit, Sundquist claimed immunity. In a lengthily opinion, Judge Buckley of the D.C. Circuit Court cited to Barr v Matteo, 360 U.S. 564 (1959) for the proposition that our courts have recognized "an individual's legitimate right to seek redress for damage caused by oppressive or malicious action on the part of officials of the Federal Government." Sundquist, 833 F2d 311, 322. In November, 1987, the Chastain court held Sundquist accountable for his liable and the Supreme Court denied certiorari.

## PROSECUTORS, LAW ENFORCEMENT and IMMUNITY CLAIMS:

Even though Imbler v Pachtman, 424 US 409 (1976) allowed some immunity for prosecutors, in Hampton v City of Chicago, 484 F2d 602 (7th Cir. 1973), cert. denied, 415 US 917 (1974) the federal court made it quite clear that prosecutors engaged in planning raids for the purposes of committing murder were not covered by immunity. In Robichaud v Ronan, 351 F2d 533 (9th Cir. 1965) and Lewis v Brautigam, 227 F2d 124 (5th Cir. 1955) the federal court held that prosecutors, sheriffs and police officers who coerce confessions from subjects, were not covered by immunity for their tortious conduct. Further, in Holton v Boman, 493 F2d 1176 (7th Cir. 1974) and Madison v Purdy, 410 F2d 99 (5th Cir. 1969) the federal courts held that when prosecutors entered into a conspiracy, they could be held liable in tort. Indeed, in Martin v Merola, 532 F2d 191 (2d Cir. 1976) the federal court insisted that when prosecutors defamed defendants in press conferences, immunity does not protect them from liability in tort.

In Robison v Via, 821 F2d 913 (2nd Cir. 1987) The Federal Court for the Second Circuit took up the immunity claims of Assistant State's Attorney Susan Via and Vermont State Trooper Harold Harrison. It seems Via and Harrison forcibly took Connie Robison's children from her and did so in a way that violated a number of Vermont's statutes. When Connie Robison sued, Via and Harrison claimed immunity. The Second Circuit reasoned:

> "We see no basis for accepting the contentions of Via and Harrison that in seizing the children they were performing a prosecutorial function. Via's presence at the seizure of the children did not transform what was fundamentally a police function into one that was prosecutorial."
> Robison v Via, 821 F2d 913, 918 (2nd Cir. 1987)

At the same time Robison v Via was winding its way through the Second Circuit, Cathy Burns case against State Prosecutor Rick Reed was progressing through the Seventh Circuit. That court held that Prosecutor Reed was "absolutely immune" from suit over his advice to the police. 894 F2d 949. The Supreme Court granted certiorari and went on to reverse. Writing for the Court, Justice White noted the research of the Federal Court of Appeals with respect to prosecutor's advice to police and reasoned:

> "We do not believe, however, that advising the police in the investigative phase of a criminal case is so "intimately associated with the judicial phase of the criminal process," Imbler, 424 U.S., at 430, 96 S.Ct., at 995, that it qualifies for absolute immunity. Absent a tradition of immunity comparable to the common- law immunity from malicious prosecution, which formed the basis for the decision in Imbler, we have not been inclined to extend absolute immunity from liability under Sec. 1983." Burns v Reed, 111 S. Ct. 1934, 1943 (1991)

The Court went on to reason that "absolute" immunity was designed to free the judicial process from the harassment and intimidation associated with litigation. Forrester, 484 U.S., at 226, 108 S.Ct., at 543. The Court held that "absolute" prosecutorial immunity, obtains only for actions that are connected with the prosecutor's role in judicial proceedings, not for every litigation-inducing conduct.Reed, 111 S. Ct. 1934, 1943.

It is noteworthy that in researching the 1871 Klu Klux Klan Act and its progeny, Justice Scalia with whom Justice Blackmun joined, offered that: "Respondent has not cited, and I have not found, a single pre-1871 case in which a prosecutor was granted absolute immunity for any of the functions contested here." Reed, 111 S. Ct. 1934, 1946.

In Buckley v Fitzsimmons , 509 U.S. ___, 125 L Ed 209, 113 S Ct 2606 (1993) Stephen Buckley filed suit against DuPage County, Illinois Prosecutor Michael Fitzsimmons and others involved in the fabrication of evidence used to convict Buckley of murder. The District Court for the Northern District of Illinois, held that the prosecutors were entitled to "absolute" immunity with respect to the fabrication of evidence. On appeal, the United States Court of Appeals for the Seventh Circuit affirmed, holding that the prosecutors had "absolute" immunity. The Appeals Court concluded that the fabricated evidence could only cause injury at the "judicial phase", and therefore, the prosecutors were entitled to, "absolute" prosecutorial immunity. The Appeals Court reasoned that conversations between the prosecutors and an evidence expert could not be the foundation of liability because the out-of-court evaluation of evidence from an expert witness causes no injury. Thus, "[p]rosecutors whose out-of-court acts cause injury only to the extent a case proceeds will be brought to heel adequately by the court," 919 F2d at 1243–44. The Appeals Court went on to reason that the defendant who has suffered the injury must rely on the court to protect his interests. Buckley appealed the decision to the United States Supreme Court and the Court granted his petition for certiorari, vacated the judgment, and remanded the case for further proceedings. Buckley, 113 S Ct at 2612

On remand, the Court of Appeals for the Seventh Circuit reaffirmed its decision. Buckley appealed again and argued that "absolute" prosecutorial immunity only applies to the act of prosecution and to acts that occur inside the courtroom during the presentation of the State's case. The Supreme Court again granted certiorari and reversed the court of appeals decision, holding that the prosecutors were not entitled to "absolute" immunity. Buckley, 113 S Ct at 2612 Buckley's suit for damages from the prosecutor for the falsification of evidence went forward.

Law Enforcement officials and their townships have had less luck with their claims of immunity than prosecutors. In Monroe v Pape, 365 U.S. 167, 81 S Ct 473 (1960) the Supreme Court took up the complaint of James Monroe and his family seeking damages from the Chicago Police and the City of Chicago for an early morning raid wherein the police:

"...broke into petitioners' home in the early morning, routed them from bed, made them stand naked in the living room, and ransacked every room, emptying drawers and ripping mattress covers....Mr. Monroe was then taken to the police station and detained on 'open' charges for 10 hours, while he was interrogated about a two-day-old murder....." Monroe v Pape, 365 U.S. 167, 81 S Ct 473, 474 (1960)

In a fifty page opinion, the Court reviewed the history of the 1871 Klu Klux Klan Act and reasoned:

"It is abundantly clear that one reason the legislation was passed was to afford a federal right in federal courts because, by reason of prejudice, passion, neglect, intolerance or otherwise, state laws might not be enforced and the claims of citizens to the enjoyment of rights, privileges, and immunities guaranteed by the Fourteenth Amendment might be denied by the state agencies" Monroe v Pape, 365 U.S. 167, 81 S Ct 473, 480 (1960)

Although the Court held that the City of Chicago was not liable on a respondeat superior theory [later expressly overturned in Monell et al v Dept Soc Serv City of New York, 436 U.S. 658 (1977)], the Court specifically held that the police officers were not entitled to immunity and instructed that suits brought with these civil rights claims : "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." Pape, 365 U.S. 167, 81 S Ct 473, 484.

This claim and the Monroe as well as the Monell decisions make the conduct of Los Angeles Police Detective Mark Furman eerily reminiscent of the early morning raid on the Monroe's in Chicago. It seems that drug counselor Albert Morales and his brother Bennie reported to the Internal Affairs office of the Los Angeles Police that Mark Furman and his fellow officers carried on just as the Chicago Police had in Monroe, in the early morning hours of November 18, 1978. The Morales brothers were awakened in their Pico Gardens apartment by Furman and his cohorts, beaten, made to stand naked and literally thrown down metal staircases. The Morales' and a public service agency attorney complained in 1978. Nothing was done. [Los Angeles Times, September 11th, 1995] Pursuant to Monroe and Monell, not only would Mark Furman be subject to liability, but as in the Rodney King debacle, so would the City of Los Angeles.

Prison Guards have little luck with immunity claims. In Procunier v Navarette, 434 U.S. 555, 98 S Ct 855 (1978) the Court turned aside prison official's claims to "absolute" immunity. In Hughes v Savell, 902 F2d 376 (5th Cir 1990), the Federal Court of Appeals ruled that the state and its prison officials must protect prisoners from other prisoners. In Moye v Selsky, 826 F. Supp. 712 (1993) the Federal District Court in New York, invoked the Second Circuit's decision in Weg v Macchiarola, 995 F2d 15 (2nd cir. 1993) as well as Cleavinger v Saxner, 474 U.S. 193, 106 S Ct 496 (1985) and held that a prison hearing officer and discipline director were not immune from 42 USC § 1983 actions to redress grievances. And in Farmer v Brennan, ___U.S. ___, 114 S Ct 1970 (1994) the Supreme Court held that prison officials were subject to liability in tort.

## GUARDIANS - APPOINTED COUNSEL and IMMUNITY CLAIMS:

Courts confronting the dereliction of duty in guardians ad litem have said:

"Role of attorney appointed for child in custody dispute is to advocate child's best interest, not the child's wishes." In re Marriage of Rolfe, 699 P.2d 79, 216 Mont.39 (l985)

"It is guardian ad litem's duty to stand in shoes of child and weigh factors as child would if his judgment were mature and he was not of tender years." J.W.F. v. Schoolcraft, 763 P.2d 1217 (Utah, l987)

"Role of the guardian ad litem in custody disputes is to zealously represent the child ..." Carter v. Brodrick, 816 P.2d 202 (Sup. Ct. Alaska 1991).

"In child custody matter, guardian ad litem does not represent child per se; rather, guardian ad litem's statutory duty is to represent concept of child's best interest." Wiederholt v. Fischer, 485 N.W.2d 442, 169 Wis.2d 524 (1992)

When guardians ad litem do not meet these minimal standards, they are subject to liability. In Collins v Tabet, 111 N.M. 391, 806 P 2d 40 (N.M. 1990), the New Mexico Supreme Court in cited to a previous case and offered:

"See also Bonds, 64 N.M. at 345, 328 P.2d at 599:

[A]ppointment as guardian ad litem of a minor is a position of the highest trust and no attorney should ever blindly enter an appearance as guardian ad litem and allow a matter to proceed without a full and complete investigation into the facts and law so that his clients will be fairly and competently represented and their rights fully and adequately protected and preserved.......The proposition in Bonds that a guardian ad litem occupies a position of the highest trust suggests that he or she is a fiduciary. Judge Donnelly, in expressing his views on the question certified to us, analogized the position of the guardian ad litem to that of a general guardian or conservator...Fiduciaries, of course, are subject to liability to their wards for harm resulting from ordinary negligence in the discharge of their fiduciary duties; if anything, they are charged with a higher standard of care than are persons who do not owe fiduciary duties. See Pino v Budwine, 90 N.M. 750, 568 P.2d 586 (1977); Estate of Guerra v New Mexico Human Services Dep't, 96 N.M. 608, 633 P.2d 716 (Ct.App. 1981). (Emphasis added)

These principles are not new. In Downs v Sawtelle, 574 F 2d 1 (1st Cir. 1978) the Federal Court of Appeals ruled that immunity was inappropriate for guardians because private parties are not confronted with the pressures of office, the decision making or the threat of liability facing, governors and highest level public officials. Although policy considerations might support some form of immunity for private citizens, the Sawtelle court noted that factors of policy and fairness might suggest some immunity for private parties acting in concert with state officials. The Sawtelle court answered that these concerns were resolved by Congress in favor of citizens who claim a deprivation of constitutional rights. Downs, 574 F 2d 1, 5.

In Reese v Danforth, 486 Pa. 479, 406 A2d 735 (1979) the Pennsylvania Supreme Court took up the case of a Public Defendant claiming immunity and stated:

". . . we hold that once the appointment of a public defender in a given case is made, his public or state function ceases and thereafter he functions purely as a private attorney concerned with servicing his client. His professional relationship with his client takes on all the obligations and protections attendant upon a private attorney-client relationship except one: the public pays his fee. In this respect, he is like the physician rendering professional services which are paid for out of public funds and, like that physician, he ought to be subject to liability for tortious conduct. E.g., Jackson v Kelly, 557 F2d 735 (10th Cir. 1977); U.S. ex rel. Fear

v Rundle, 506 F2d 331 (3d Cir. 1974)." Reese v Danforth, 486 Pa. 479, 486, 406 A2d 735, 737 (1979)

In 1979, the Supreme Court took up the case of Ferri v Ackerman, 444 U.S. 193, 100 S.Ct. 402 (1979) wherein an appointed attorney claimed "judicial immunity" for his representation of a criminal defendant. The Court suggested that there is a marked difference between the nature of an appointed attorney's work and those of other officers of the court. As public servants, the Court reasoned, the prosecutor and the judge represent the interest of society as a whole. The conduct of their official duties may adversely affect a wide variety of different individuals, each of whom may be a potential source of future controversy. But, the Court made a strong distinction:

"In contrast, the primary office performed by appointed counsel parallels the office of privately retained counsel. Although it is true that appointed counsel serves pursuant to statutory authorization and in furtherance of the federal interest in insuring effective representation of criminal defendants, his duty is not to the public at large, except in that general way. His principal responsibility is to serve the undivided interests of his client. Indeed, an indispensable element of the effective performance of his responsibilities is the ability to act independently of the Government and to oppose it in adversary litigation. The fear that an unsuccessful defense of a criminal charge will lead to a malpractice claim does not conflict with performance of that function. If anything, it provides the same incentive for appointed and retained counsel to perform that function competently. The primary rationale for granting immunity to judges, prosecutors, and other public officers does not apply to defense counsel sued for malpractice by his own client." Ferri v Ackerman, 444 U.S. 193, 204, 100 S.Ct. 402, 409 (1979). (Emphasis added).

The Michigan Court of Appeals took up a similar case in 1980. In Donigan v Finn, 95 Mich App 28, 290 NW2d 80, (1980) In Donigan an appointed counsel asked for immunity from suit for malpractice. The Michigan court recited:

"Our issue of first impression is whether appointed attorneys for indigent criminal defendants are immune from malpractice liability in a state action in connection with the defense of an accused indigent. We conclude that they are not immune." Donigan v Finn, 95 Mich App 28, 290 NW2d 80, 81 (1980)

In 1984 the United States Supreme Court again took up the claims of an appointed attorney that he should be immune from suit for malpractice. In Tower v Glover, 467 U.S. 914, 104 S Ct 2820 (1984) the Court recognized the assertion of the public defender that he had responsibilities similar to those of the judge and prosecutor and should enjoy similar immunities in order, not to impair the State's attempt to meet its constitutional obligation to furnish criminal defendants with effective counsel.

Glover, 104 S. Ct. 2820, 2822. Writing for the Court Madam Justice O'Connor reasoned:

"State public defenders are not immune from liability under Sec 1983 for intentional misconduct by virtue of alleged conspiratorial action with the state officials that deprives their clients of federal rights. For purposes of Sec. 1983, immunities are predicated upon a considered inquiry into the immunity historically accorded the relevant official at common law and the interests behind it." Glover, 104 S. Ct. 2820, 2821-22 (1984)

The Court went on to hold:

"We conclude that state public defenders are not immune from liability under Sec. 1983 for intentional misconduct, "under color of" state law, by virtue off alleged conspiratorial action with state officials that deprives their clients of federal rights." Tower v Glover, 104 S. Ct. 2820, 2826 (1984)

Following Ferri v Ackerman and Tower v Glover, state courts took up the claims of guardians and appointed counsel for "absolute immunity", "judicial immunity" and "quasi-judicial immunity" and routinely held that granting these attorneys immunity would encourage slip-shod work. See: Eli Bon E.I. Bon Ghananee v Black, 504 A2d 281, 284 (1986); Williams v Office of the Public Defender County of Lehigh, 586 A2d 924, 927 (1990); and Dziubak v Mott, 486 Nw2d 837 (Minn App 1992): "Unlike judges or prosecutors, the duty of the public defender is not to the public at large but rather to the individual client." 486 NW2d 837, 840.

Curiously, the Court's holding in Ferri v Ackerman, 444 U.S. 193, 100 S.Ct. 402, (1979) has been made part of federal legislative efforts. Ferri came up in the 96th Congress in Senate bill 2617 and died in committee. It came up again in the 97th Congress in House bill 3060 and died in committee. Again Ferri was the subject of legislative efforts in the 98th Congress in Senate bill 829, Senate bill 2420, House bill 4307 and House bill 3233. Each time it died in committee or was dropped from

override legislation. No immunity legislation for court appointed counsel be they guardians, criminal/defense or appellate counsel has passed.

## SOCIAL WORKERS and IMMUNITY CLAIMS:

Perhaps the most outrageous acts for which the actors claim immunity occurs in child abuse proceedings. After the passage of the Mondale Acts requiring mandatory reporting of suspected child abuse, the number of child seizures soared in America. While it is certainly the case that children must be protected from abuse and neglect, doing so at the expense of constitutional rights is most often an untenable argument. With the exception of a few aberrant decisions, most state and federal courts have allowed only partial or "good faith" immunity in child seizure cases. As the Supreme Court cautioned in Malley v Briggs, 475 U.S. 335, 341, 106 S Ct 1092 (1986):

"[a]s qualified immunity has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." 475 U.S. 335, 341.

A few plain incompetents and knowing violators will illustrate.

Social Workers Ronald Borel and Janenne Trahan allegedly filed a false verified statement with the court to facilitate their removal of Karen Austin's two daughters. When the girls were returned, Ms. Austin filed a 42 USC § 1983 action. The Federal District Court dismissed Ms. Austin's action on immunity grounds, but the U. S. Court of Appeals for the Fifth Circuit reasoned:

"We note that Louisiana law authorizes police officers, as well as child abuse workers, to file verified complaints. A police officer would clearly not be entitled to absolute immunity in filing such a complaint. The functional approach to immunity requires that officials performing identical functions be treated alike." Austin v Borel, 830 F2d 1356, 1362-63 (1987)

The Court went on to hold that these caseworkers were not entitled to the "absolute" immunity they claimed after the filing of the false verified complaint. 830 F2d 1356, 1363.

The Tenth Circuit in Snell v Tunnell, 920 F 2d 673, 687 (1990) declined to confer immunity on two social workers who decided to continue an investigation of child abuse despite the fact that the district attorney and the police had investigated and refused to be involved any longer. The court held the social workers liable when despite the insistence of the police, the workers removed the plaintiff's child from his home.

The Ninth Circuit applied the balancing test of Mathews v Eldridge, 424 U.S. 319, 96 S Ct 893 (1976) and the reasoning in Cleveland Board of Education v Loudermill, 470 U.S. 532, 105 S Ct 1487 (1985) in the 1990 case of Chalkboard, Inc. v Brandt, 902 F2d 1375 (9th Cir. 1980) social workers from the Arizona Department of Health Services and the Department of Economic Security summarily pulled Chalkboard Inc's. Day Care license when a parent complained of child abuse in the day care facility. Without giving Chalkboard notice, a hearing or an opportunity to be heard, the social workers essentially ruined the center on charges that were never substantiated. The Court opined:

"A balancing of these factors, as they were applied in Matthews and, subsequently, in Loudermill, leads us to conclude that the administrative procedures followed by defendants in this case could not reasonably have been believed to meet constitutional requirements." Chalkboard, Inc., 902 F2d 1375, 1380-81

Writing for the court, Judge Canby reasoned that the state legislature made clear provisions for child abuse claims and licensees. He noted that: "In ignoring these procedures and summarily suspending Chalkboard's licence without notice or an opportunity to respond, reasonable officials would have known that their actions were not lawful." Chalkboard, Inc. 902 F2d 1375, 1382. Judge Canby and the court made clear that "the risk of error is considerable when such determinations are made after hearing only one side." 902 F2d 1375, 1381. The court held that as the defendant social workers chose not to follow the state mandated procedures, no immunity pertained to their acts. 902 F2d 1375, 1382.

In Millspaugh v County Department of Public Welfare of Wabash County, 937 F2d 1172 (7th Cir. 1991) the Seventh Circuit Court of Appeals wrestled with the conduct of Indiana social worker Manetta Tucker. In this case, Ms. Tucker determined that Lois Millspaugh and Tina Dyson's religious group, "Faith Ministries" and their practice of giving away all their possessions made the womens' four daughters "children in need of services". Tucker petitioned the court to remove the children while withholding from the court the report of a physician and a clinical psychologist who'd examined the girls and

found them to be fine. Tucker also withheld that Lois Millspaugh's daughter Jean was her high school valedictorian.

Writing for the court, Judge Easterbrook noted that bowing to the social workers' claims on immunity "may embolden social workers to pursue their private agendas--as the mothers say Tucker did, using her position to throttle unorthodox religious practices." Millspaugh, 937 F2d 1172, 1177 (7th Cir. 1991). The court held that:

> "absolute immunity does not protect the gathering of evidence, even though the acts of presenting that evidence to (or withholding it from) the court receive greater protection. Social workers must settle for qualified immunity when taking initial custody of children." Millspaugh, 937 F2d 1172, 1176 (7th Cir. 1991)

The merit less claims to immunity of state social workers stand out in bold relief in the tortured Babcock v State of Washington, 116 Wash 2d 596, 809 P 2d 143 (Wash. 1991). In this case, Rudolph Babcock and his wife Ann were married in 1970. Ann Babcock already had two daughters from a previous marriage. Rudolph and Ann had two daughters before Ann committed suicide shortly after the family moved to Louisiana in 1970. By 1981, Rudolph was unable to manage the four girls and the state of Louisiana determined that the children were in need of care. After a hearing, the Louisiana court placed the girls with Rudolph's parents, Elizabeth and Willis Babcock of Richland, Washington. The supervision of the case was transferred to Washington on interstate compact. One Lee Michael, the husband of the deceased Ann Babcock's sister (and thus the children's maternal uncle by marriage) began a campaign to have the girls placed in his home.

Working with Washington State social workers on the one hand and undercutting the elderly Babcocks on the other, Michael persuaded the Washington Department of Health and Social Services to allow Aryn, Rudolph's fourteen year old adopted daughter, to come and live in the Michael home. A DSHS attorney obtained the Louisiana court's relinquishment of jurisdiction and DSHS social workers began to work with Michael to place all of Rudolph's children in the Michael home. What the social workers left out of their "investigation" of Lee Michael, what they left out of their "home study" of Lee Michael was that Mr. Michael "had a criminal record dating back to 1967 which included charges of forcible rape, sexual assault, and attempted rape." Babcock v State, 809 P 2d 143, 146.

As Michael's undermining of the elderly Babcock's became apparent, Rudolph fled the state with his two biological daughters. The social workers from the DSHS presumed upon the courts to issue an arrest warrant for Rudolph and forced the two remaining Babcock girls to return. Shortly thereafter, the DSHS workers and the court placed the remaining girls with Mr. Michael. Lee Michael assaulted and raped all four of the girls and was subsequently convicted and sentenced to fifty five years in prison. When Rudolph, the girls and the grandparents filed suit, the social workers and the DSHS claimed immunity.

In a tortured series of twists and turns through the legal system, the Washington Supreme Court threw the case out but then agreed to re-hear it as the DSHS and social workers caused the Court to rely on false information. In a lengthy opinion, the Court en banc noted that the DSHS social workers never investigated Lee Michael; placed the children without court orders and then got them later; placed the children without giving their father notice or an opportunity to be heard, and then did it again, and again. The social workers sought "absolute prosecutorial immunity" but the court reasoned "DSHS cites no case where this court has extended prosecutorial or judicial immunity to anyone but prosecutors and judges. Judges and prosecutors in this state are usually elected and highly visible officials." Babcock v State, 809 P2d 143, 149; and went on to offer "The gravamen of this complaint is negligent investigation. Even prosecutors cannot claim unqualified immunity for performing investigatory functions under 42 U.S.C. Sec. 1983." Babcock v State, 809 P2d 143, 151.

In an exhaustive review of their previous mistakes in "Babcock 1" as well as the underpinnings of immunity claims, the court went on to note:

> "The Legislature has already chosen to deny caseworkers absolute immunity. In addition, binding state precedent and federal precedent under 42 U.S.C. Sec. 1983 show that the common law does not support absolute immunity from tort liability for negligent foster care investigation and placement in this case." Babcock v State, 809 P2d 143, 149.

Writing for the court, Justice Utter noted:

> "Absolute Immunity shields the recipient from liability for willful misconduct as well as negligence. A caseworker cloaked in absolute immunity could deliberately arrange a foster care placement with a known rapist in order to facilitate the sexual abuse of a child and escape tort liability. This should not be the law." Babcock v State, 809 P2d 143, 149.

Finally, the court noted: "State precedent and legislative policy compel us to reject the caseworkers' claim to absolute

ITY BROKEN

immunity. The precedent of intermediate and lower federal courts under 42 U.S.C. Sec. 1983 supports the same result." 809 P2d 143, 150. And the court held that the acts of the DSHS and its social workers were not entitled to any type of immunity at all: "Legislative policy requires us to hold that DSHS cannot claim the qualified immunity of its caseworkers as does the majority of precedent on the subject.", 809 P2d 143, 155.

## *PRIVATE PARTY IMMUNITY CLAIMS:*

Private persons acting with a colorable claim under state law, or acting in concert with law enforcement officials cannot claim immunity under 42 USC § 1983. Adickes v S. H. Kress & Co., 398 U. S. 144, 152 (1970) may be seen as the origin of the "joint participation" doctrine advanced some years later in Lugar v Edmondson Oil Co, Inc., 457 U. S. 922 (1982). This doctrine received further refinement in Dennis v Sparks, 449 U.S. 24 (1986) where the Court sustained plaintiffs cause on the theory that private party conspirators to an injunction, acted under color of state law and in joint participation with state authorities.

In Howerton v Garcia, 708 F 2d 380 (9th Cir. 1983) the Federal Court of Appeals for the Ninth Circuit ruled that landlords who evicted a plaintiff without proper eviction procedures could make no legitimate claim to immunity:

> "...there is no good faith immunity under section 1983 for private parties who act under color of state law to deprive an individual of his or her constitutional rights" 708 F 2d 380, 381.

In F.E. Trotter Inc. V Watkins, 869 F 2d 1312, 1318 (9th Cir. 1989) the Ninth Circuit ruled that there is no legitimate immunity claim for a private contractor's actions while completing a land survey for the Navy. In Wyatt v Cole, 504 U.S. ___, 118 L. Ed 2d 504, 112 S Ct ___ (1992) the Supreme Court expanded its holdings with respect to immunity claims and private parties and ruled that even when relying in good faith, upon state statutes for replevin or garnishment, when the statutes are later declared unconstitutional, no immunity, not even "qualified immunity" may apply to the acts of private persons.

The Supreme Court, lesser Federal and State courts have made it quite clear that immunity must be granted very sparingly. Indeed, in Scheuer v Rhodes, 416 US 232 (1974) the Supreme Court turned aside arguments for immunity as it applied to governors. In Wood v Strickland, 420 US 308 (1975) the Supreme Court refused to give immunity to members of school boards, and in Hazo v Geltz, 537 F2d 747 (3d Cir. 1976) the federal court insisted that court personnel performing many of their functions were entitled to only "good faith immunity". In recent years, the court has refused to expand the concept of immunity to prison directors, Procunier v Navarette, 434 US 555 (1978) and to cabinet officers as well as their principle subordinates Butz v Economou, 98 S.Ct. 2894 (1978).

Clearly, "immunity" is on the wane.

In the oft-cited Monroe v Pape 365 US 167 (1961) the Court said that actions undertaken by those who would claim immunity:

> "Should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." 365 US at 187, 81 S Ct, 484 (1961).

## C. BULLOCK V HUSTER - AN EXAMPLE OF IMMUNITY BROKEN

Bullock v Huster, 209 Mich App 551, ___ NW2d ___ (April 1995) is an intentional tort, negligence and breach of fiduciary duty action. The minor Plaintiff, Renee Bullock, is twelve (12) ears of age. This action is brought by her biological father, Ronald L. Bullock, as next friend.

Renee was born to Ronald Bullock and Sharon Pope in May of 1983. When the Bullock/Pope relationship broke down, Ms. Pope took the child and left Mr. Bullock's home in the Spring of 1985. Contemplating legal action, Mr. Bullock, a General Motors: Cadillac Division engineer, had himself psychologically evaluated by Dr. Louise Centers who found him to show no pathology and to be thoroughly normal.

In July of 1986, Protective Services worker Shaffer of the Wayne County Department of Social Services documented child abuse by Sharon Pope on the older child in her home. Mr. Bullock attempted to change the living arrangement of his daughter through the court and pursuant to an Order for independent psychological evaluation by Referee Adele Jones of the Wayne County Circuit Court, Dr. John W. Francisco, completed a detailed psychological evaluation of Ms. Pope, Mr.

Bullock and the child in January of 1987.

Pursuant to Court order, Dr. Francisco found Mr. Bullock to be normal, but Ms. Pope to show signs of serious psycho-pathology. In a follow-up, Dr. Francisco explained to Referee Adele Jones that Ms. Pope had coached the minor child to allege sex abuse charges against Mr. Bullock. Thereafter, Mr. Bullock underwent a polygraph examination in reference to sex abuse allegations with Marcy Consulting and passed. Ms. Pope took the same polygraph examination with Marcy Consulting in reference to the fabrication of sex abuse allegations and failed.

In a supplemental report in March of 1987, court appointed expert, Dr. Francisco, indicated that it was clearly Sharon Pope's idea to make-up the sex abuse allegations. Ms. Pope refused to continue with Dr. Francisco and took the minor child, Renee, to psychiatrist, Jaime Ayala. In his report dated May 1987, Dr. Ayala indicates that Sharon Pope shows signs of serious psycho-pathology. In a follow-up September 1987 evaluation by psychologist Susan Hamilton, Ms. Pope was said to be "shopping for witnesses who will verify her fraudulent allegations of sex abuse".

False allegations of sex abuse in custodial matters have been described as the cruelest, most reprehensible and damaging allegation one parent can make against the other parent. See: Wakefield and Ungerwager, Accusations of Child Sexual Abuse (Springfield: Charles Thomas, 1990) and Lorandos and Campbell, "Myths and Realities of Sexual Abuse Evaluation and Diagnosis: A Call for Judicial Guidelines", Issues in Child Abuse Accusations, Volume 7, Number 1, 1995. In a detailed custody hearing in front of Wayne County Michigan, Friend of the Court Referee Jones in October of 1987, the Referee recommended that legal and physical custody of the minor child, Renee Bullock should be vested in her biological father, Ronald Bullock. Sharon Pope protested, and the matter was set for trial in front of the Honorable Sharon Tevis Finch.

Mr. Bullock and his daughter, Renee, participated in supervised visitation and counseling with psychiatrist, Jaime Ayala, and in a March 1988 report to the Court, Dr. Ayala indicated that Mr. Bullock showed no pathology but that little Renee had been traumatized by her mother, Sharon Pope. Responding to the significant difficulties plead, the Honorable Sharon Tevis Finch appointed a Guardian ad Litem, Defendant-Appellant in this action, Bette Huster, on April 6, 1988. It was at this point that little Renee's life became significantly worse.

Immediately after being appointed as the Guardian ad Litem and hearing of the unsubstantiated and fallacious sex abuse allegations, Ms. Huster, upon exiting the courtroom, pointed her finger at Plaintiff/Appellee and said "and you, I'm not even going to talk to you!". Both little Renee's elderly grandparents were present and were shocked at Ms. Huster's orientation. Their shock and chagrin over her thorough lack of professionalism and outrageous bias became deeper and deeper throughout the process of this cause. They filed affidavits of complaint. Nothing was done about it.

Soon after Ms. Huster's appointment, she alienated both court appointed experts, Dr. Francisco and Dr. Ayala. Both of these doctors filed affidavits of complaint about Ms. Huster. Nothing was done about them. Indeed, in his Affidavit Dr. Ayala complains that when he was preparing to come to court and testify about the serious psycho-pathology in Ms. Pope and the trauma to the minor child, Ms. Huster insisted:

"you don't belong here and you're not coming into court. As far as I'm concerned there is nothing you and Dr. Francisco have to say that I'm interested in hearing" ( Attached to Plaintiff's Appeal Brief as Exhibit C at p 2).

In a May 1988 report by Friend of the Court investigators Mazur and Moryc, cited Sharon Pope's abuse and psychiatric problems and recommended custody be vested in Ron Bullock.

In a June 1988 letter to the Honorable Sharon Tevis Finch, court appointed psychologist, Dr. Francisco, complained about Ms. Huster's actions in this case. Three weeks later, court appointed psychiatrist Dr. Ayala wrote to the Honorable Sharon Tevis Finch complaining of Ms. Huster's actions as well. Again, nothing was done about the complaints. Somehow, Ms. Huster was able to preclude the bulk of the testimony from experts Ayala and Francisco, and also to keep away from Judge Finch the devastating truth of Ms. Pope's failing the polygraph. Apparently the Court was so hoodwinked by Ms. Huster and her collusion with Sharon Pope, that the Court awarded custody to Sharon in December of 1988.

In April of 1989, Dr. Ayala wrote to the Court again complaining about Sharon's serious psychiatric problems. Dr. Francisco did the same and reiterated his concern about the "SAID" syndrome (Sexual Allegations in Divorce). Despite Dr. Fransisco's predictions that Ms. Pope would act out inappropriately against the child and flee, the Guardian ad Litem did nothing. In June of 1989, Ms. Pope went underground and fled to Georgia with her children, concealed her whereabouts, used a relative's name and social security number to buy a car, open a bank account and obtain a driver's license. In October of 1990, she was convicted in the Wayne County Circuit Court and sentenced to 90 days in jail and 500 hours of community service.

Pursuant to Court order following the kidnaping, Melvin J. Guyer, Ph.D., J.D. of the Department of Psychiatry of the University of Michigan Children's Psychiatric Hospital was commissioned by the Court to conduct an independent psychological evaluation of the parties. Dr. Guyer is a licensed attorney in the State of Michigan and professor in the Department of Psychiatry at the University of Michigan Children's Psychiatric Hospital. Dr. Guyer wrote to the judge in December of 1990, complaining about Ms. Pope's visitation refusal and psychiatric difficulties. When she was finally coerced to participate in the court ordered evaluation process, a psychological evaluation was conducted by Dr. Guyer's associate, Dr. Horner, wherein Sharon Pope was seen to have an IQ of 89 with serious psycho-pathology, but Ron Bullock was seen to have an IQ of 108 with normal personality. After completing a significant review of all of the psychological and psychiatric data, Professor Guyer authored a 24 page report describing Sharon Pope as pathological, a liar and someone who has been seriously abusing the minor child. Mr. Bullock was seen to be warm, normal and someone in whom custody should be vested immediately.

After receipt of Dr. Guyer's evaluation, Mr. Bullock was seriously injured in an automobile accident. During his convalescence, Mr. Bullock hired an expert in law and clinical psychology to review the entire file so as to come to some determination as to a plan with respect to the child's best interest. During the process of this detailed review, two additional independent expert evaluators in law and psychiatry were consulted and the opinion of these experts lead Mr. Bullock to petition the Wayne County Circuit Court to remove Guardian ad Litem from the custody case.

On December 22, 1992, Judge Sharon Tevis Finch signed an Order appointing Mr. Bullock next friend for the purposes of prosecuting this action. On February 2, 1993, Judge Finch declined to remove Guardian Bette Huster from the custody file without evidence of wrong-doing, however, Judge Finch made it clear that this would be her action when evidence of wrong-doing was made known to her. On this very same date, during the process of taking Dr. Guyer's deposition, Guardian ad Litem Huster and attorney for Ms. Pope objected when attorney for the father began to inquire of expert Guyer concerning the misrepresentation of little Renee Bullock's best interest by the Guardian ad Litem. The deposition was halted, and the parties telephoned Judge Finch who directed the parties, in a separate record, that expert witness Guyer (qualified as a psychologist expert and as an expert in law) could testify with respect to hypotheticals concerning representation and misrepresentation of the child by the Guardian ad Litem.

When expert Guyer was asked if it became known to him that a Guardian ad Litem had misrepresented the facts to him or any expert like him in a custody matter, would that constitute adequate representation? The response was clear: "I would regard that as inadequate representation". (Dep. 2/2/93, p 185, l 4-10 ). When specifically asked by counsel if a Guardian ad Litem was discovered to have called an expert witness the evening before the expert was scheduled to testify about the serious psychopathology in a custodial mother and told the expert witness that they would not be allowed to testify, despite having been subpoenaed by the biological father's attorney, "would that make any suggestions to you regarding her representation of the child's best interest?" whereupon expert Guyer offered:

> "Well, it would seem ... the adversary process, even in these cases is intended to bring all the information before the court to make well-informed decision. If someone interfered with that process, I think in this instance it would interfere with the Court's ability to determine and assess the best interests of the child. **So it would run against the child's best interest rather than furtherance of it.**" (Dep. 2/2/93, p186, l 12-19 emphasis added).

Continuing in a separate record, expert Guyer was asked if the Guardian ad Litem knew of the report of the court appointed expert describing serious psycho- pathology in the mother, and yet:

> "represented to the court that Renee should remain with Sharon Pope as custodial parent, would you consider and regard that as adequate representation?"

> Answer: "No, I would not." (Dep. 2/2/93, p 202, l 16-20).

And when asked in a cumulative hypothetical, if a Guardian ad Litem was aware of the reports of serious psycho-pathology in biological mother, reports of physical abuse perpetrated by biological mother, kidnaping by the biological mother, false allegations of sex abuse perpetrated by the biological mother and still recommended, even in spite of the biological father being seen to be normal, warm, caring, that the child be forced to remain with the biological mother, "would you regard that as adequate representation of this child?" The answer was simply "No." (Dep. 2/2/93, p 206).

On February 25, 1993, Appellant-Defendant Huster petitioned Judge Finch for Summary Disposition of this cause. At a hearing held March 26, 1993, the father as next friend vigorously argued that the Court's do not sit as a super-legislator and that collateral estoppel has no place in this action. The Court agreed. When Appellant filed a Motion for Reconsideration and

for Stay of Proceeding Pending Appeal on April 9, 1993, the father as next friend opposed the reconsideration as did the Court.

The Michigan Court of Appeals heard oral argument on Huster's interlocutory appeal in November of 1994. On April 3rd, 1995 they issued their opinion: No immunity for Guardians ad Litem. The decision caused a stir among court appointed guardians in Michigan. In the Michigan Lawyer's Weekly, these court appointed attorneys whined and complained that now they'd be subject to suit by disgruntled parents. And they'd have no insurance coverage. 9 Mich L. W. 837, April 24, 1995. The response was simple: Bullock is about negligence, not insurance.

Demosthenes Lorandos, Ph.D., J.D.
214 North Fourth Avenue, Ann Arbor, Michigan 48104
Telephone [734] 327-5030 - Facsimile [734] 327-5032

APPENDIX G

## Universal Declaration of Human Rights

(Adopted by United Nations General Assembly Resolution 217A (III) of December 10, 1948)

Whereas recognition of the inherent dignity and of the equal and inalienable rights of all members of the human family is the foundation of freedom, justice and peace in the world,

Whereas disregard and contempt for human rights have resulted in barbarous acts which have outraged the conscience of mankind, and the advent of a world in which human beings shall enjoy freedom of speech and belief and freedom from fear and want has been proclaimed as the highest aspiration of the common people,

Whereas it is essential, if man is not to be compelled to have recourse, as a last resort, to rebellion against tyranny and oppression, that human rights should be protected by the rule of law,

Whereas it is essential to promote the development of friendly relations between nations,

Whereas the peoples of the United Nations have in the Charter reaffirmed their faith in fundamental human rights, in the dignity and worth of the human person and in the equal rights of men and women and have determined to promote social progress and better standards of life in larger freedom,

Whereas Member States have pledged themselves to achieve, in cooperation with the United Nations, the promotion of universal respect for and observance of human rights and fundamental freedoms,

Whereas a common understanding of these rights and freedoms is of the greatest importance for the full realization of this pledge,

Now, therefore,

The General Assembly

Proclaims this Universal Declaration of Human Rights as a common standard of achievement for all peoples and all nations, to the end that every individual and every organ of society, keeping this Declaration constantly in mind, shall strive by teaching and education to promote respect for these rights and freedoms and by progressive measures, national and international, to secure their universal and effective recognition and observance, both among the peoples of Member States themselves and among the peoples of territories under their jurisdiction.

### Article 1

All human beings are born free and equal in dignity and rights. They are endowed with reason and conscience and should act towards one another in a spirit of brotherhood.

Universal Declaration of Human Rights:

### Article 2

Everyone is entitled to all the rights and freedoms set forth in this Declaration, without distinction of any kind, such as race, color, sex, language, religion, political or other opinion, national or social origin, property, birth or other status. Furthermore, no distinction shall be made on the basis of the political, jurisdictional or international status of the country or territory to which a person belongs, whether it be independent, trust, non-self-governing or under any other limitation of sovereignty.

### Article 3

Everyone has the right to life, liberty and security of person.

### Article 4

No one shall be held in slavery or servitude; slavery and the slave trade shall be prohibited in all their forms.

### Article 5

No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment.

### Article 6

Everyone has the right to recognition everywhere as a person before the law.

### Article 7

All are equal before the law and are entitled without any discrimination to equal protection of the law. All are entitled to equal protection against any discrimination in violation of the Declaration and against any incitement to such discrimination.

### Article 8

Everyone has the right to an effective remedy by the competent national tribunals for acts violating the fundamental rights granted him by the constitution or by law.

### Article 9

No one shall be subjected to arbitrary arrest, detention or exile.

Universal Declaration of Human Rights:
Page 2 of 6

## Article 10

Everyone is entitled in full equality to a fair and public hearing by an independent and impartial tribunal, in the determination of his rights and obligations and of any criminal charge against him.

## Article 11

1.  Everyone charged with a penal offence has the right to be presumed innocent until proved guilty according to law in a public trial at which he has had all the guarantees necessary for his defence.

2.  No one shall be held guilty of any penal offence on account of any act or omission which did not constitute a penal offence, under national or international law, at the time it was committed. Nor shall a heavier penalty be imposed than the one that was applicable at the time the penal offence was committed.

## Article 12

No one shall be subjected to arbitrary interference with his privacy, family, home or correspondence, nor to attacks upon his honour and reputation. Everyone has the right to the protection of the law against such interference or attacks.

## Article 13

1.  Everyone has the right to freedom of movement and residence within the borders of each state.

2.  Everyone has the right to leave any country, including his own, and to return to his country.

## Article 14

1.  Everyone has the right to seek and to enjoy in other countries asylum from persecution.

2.  This right may not be invoked in the case of prosecutions genuinely arising from non-political crimes or from acts contrary to the purposes and principles of the United Nations.

## Article 15

1.  Everyone has the right to a nationality.

2.  No one shall be arbitrarily deprived of his nationality nor denied the right to change his nationality.

Universal Declaration of Human Rights:
Page 3 of 6

## Article 16

1.   Men and women of full age, without any limitation due to race, nationality or religion, have the right to marry and to found a family. They are entitled to equal rights as to marriage, during marriage and at its dissolution.

2.   Marriage shall be entered into only with the free and full consent of the intending spouses.

3.   The family is the natural and fundamental group unit of society and is entitled to protection by society and the State.


## Article 17

1.   Everyone has the right to own property alone as well as in association with others.

2.   No one shall be arbitrarily deprived of his property.


## Article 18

Everyone has the right to freedom of thought, conscience and religion; this right includes freedom to change his religion or belief, and freedom, either alone or in community with others and in public or private, to manifest his religion or belief in teaching, practice, worship and observance.


## Article 19

Everyone has the right to freedom of opinion and expression: this right includes freedom to hold opinions without interference and to seek, receive and impart information and ideas through any media and regardless of frontiers.


## Article 20

1.   Everyone has the right to freedom of peaceful assembly and association.

2.   No one may be compelled to belong to an association.


## Article 21

1.   Everyone has the right to take part in the government of his country, directly or through freely chosen representatives.

2.   Everyone has the right of equal access to public service in his country.

3.   The will of the people shall be the basis of the authority of government; this will shall be expressed in periodic and genuine elections which shall be by universal and equal suffrage and shall be held by secret vote or by equivalent free voting procedures.

Universal Declaration of Human Rights:
Page 4 of 6

### Article 22

Everyone, as a member of society, has the right to social
security and is entitled to realization, through national effort
and international cooperation and in accordance with the
organization and resources of each State, of the economic, social
and cultural rights indispensable for his dignity and the free
development of his personality.

### Article 23

1.   Everyone has the right to work, to free choice of
employment, to just and favourable conditions of work and to
protection against unemployment.

2.   Everyone, without any discrimination, has the right to equal
pay for equal work.

3.   Everyone who works has the right to just and favourable
remuneration ensuring for himself and his family an existence
worthy of human dignity, and supplemented, if necessary, by other
means of social protection.

4.   Everyone has the right to form and to join trade unions for
the protection of his interests.

### Article 24

Everyone has the right to rest and leisure, including reasonable
limitation of working hours and periodic holidays with pay.

### Article 25

1.   Everyone has the right to a standard of living adequate for
the health and well-being of himself and of his family, including
food, clothing, housing and medical care and necessary social
services, and the right to security in the event of unemployment,
sickness, disability, widowhood, old age or other lack of
livelihood in circumstances beyond his control.

2.   Motherhood and childhood are entitled to special care and
assistance. All children, whether born in or out of wedlock,
shall enjoy the same social protection.

### Article 26

1.   Everyone has the right to education. Education shall be
free, at least in the elementary and fundamental stages.
Elementary education shall be compulsory. Technical and
professional education shall be made generally available and
higher education shall be equally accessible to all on the basis
of merit.

Universal Declaration of Human Rights:
Page 5 of 6

2.    Education shall  be directed  to the full development of the
human personality  and to  the strengthening of respect for human
rights and fundamental freedoms.  It shall promote understanding,
tolerance and  friendship among  all nations, racial or religious
groups, and  shall further  the activities  of the United Nations
for the maintenance of peace.

3.    Parents have  a prior  right to choose the kind of education
that shall be given to their children.


## Article 27

1.    Everyone has the right freely to participate in the cultural
life of  the community,  to  enjoy  the  arts  and  to  share  in
scientific advancement and its benefits.

2.    Everyone has  the right  to the  protection of the moral and
material interests  resulting from  any scientific,  literary  or
artistic production of which he is the author.


## Article 28

Everyone is entitled to a social and international order in which
the rights  and freedoms  set forth  in this  Declaration can  be
fully realized.


## Article 29

1.    Everyone has duties to the community in which alone the free
and full development of his personality is possible.

2.    In the  exercise of  his rights and freedoms, everyone shall
be subject  only to  such limitations  as are  determined by  law
solely for  the purpose  of securing  due recognition and respect
for the  rights and  freedoms of  others and  of meeting the just
requirements of  mortality, public  order and the general welfare
in a democratic society.

3.    These rights  and freedoms  may  in  no  case  be  exercised
contrary to the purposes and principles of the United Nations.


## Article 30

Nothing in  this Declaration  may be  interpreted as implying for
any State, group or person any right to engage in any activity or
to perform  any act aimed at the destruction of any of the rights
and freedoms set forth herein.


Universal Declaration of Human Rights:
Page 6 of 6

# # #

Return to Table of Contents for

APPENDIX #

1866 Civil Rights Act
14 Stat. 27-30, April 9, 1866 A.D.

CHAP. XXXI. -- An Act to protect all Persons in the United States in their Civil Rights, and furnish the Means of their Vindication.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States; and such citizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall have the same right, in every State and Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding.

Sec. 2. And be it further enacted, That any person who, under color of any law, statute, ordinance, regulation, or custom, shall subject, or cause to be subjected, any inhabitant of any State or Territory to the deprivation of any right secured or protected by this act, or to different punishment, pains, or penalties on account of such person having at any time been held in a condition of slavery or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, or by reason of his color or race, than is prescribed for the punishment of white persons, shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by fine not exceeding one thousand dollars, or imprisonment not exceeding one year, or both, in the discretion of the court.

Sec. 3. And be it further enacted, That the district courts of the United States, within their respective districts, shall have, exclusively of the courts of the several States, cognizance of all crimes and offences committed against the provisions of this act, and also, concurrently with the circuit courts of the United States, of all causes, civil and criminal, affecting persons who are denied or cannot enforce in the courts or judicial tribunals of the State or locality where they may be any of the rights secured to them by the first section of this act; and if any suit or prosecution, civil or criminal, has been or shall be commenced in any State court, against any such person, for any cause whatsoever, or against any officer, civil or military, or other person, for any arrest or imprisonment, trespasses, or wrongs done or committed by virtue or under color of authority derived from this act or the act establishing a Bureau for the relief of Freedmen and Refugees, and all acts amendatory thereof, or for refusing to do any act upon the ground that it would be inconsistent with this act, such defendant shall have the right to remove such cause for trial to the proper district or circuit court in the manner prescribed by the "Act relating to habeas corpus and regulating judicial proceedings in certain cases," approved March three, eighteen hundred and sixty-three, and all acts amendatory thereof. The jurisdiction in civil and criminal matters hereby

conferred on the district and circuit courts of the United States shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where such laws are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offences against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of the cause, civil or criminal, is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern said courts in the trial and disposition of such cause, and, if of a criminal nature, in the infliction of punishment on the party found guilty.

Sec. 4. *And be it further enacted,* That the district attorneys, marshals, and deputy marshals of the United States, the commissioners appointed by the circuit and territorial courts of the United States, with powers of arresting, imprisoning, or bailing offenders against the laws of the United States, the officers and agents of the Freedmen's Bureau, and every other officer who may be specially empowered by the President of the United States, shall be, and they are hereby, specially authorized and required, at the expense of the United States, to institute proceedings against all and every person who shall violate the provisions of this act, and cause him or them to be arrested and imprisoned, or bailed, as the case may be, for trial before such court of the United States or territorial court as by this act has cognizance of the offence. And with a view to affording reasonable protection to all persons in their constitutional rights of equality before the law, without distinction of race or color, or previous condition of slavery or involuntary servitude, except as a punishment for crime, whereof the party shall have been duly convicted, and to the prompt discharge of the duties of this act, it shall be the duty of the circuit courts of the United States and the superior courts of the Territories of the United States, from time to time, to increase the number of commissioners, so as to afford a speedy and convenient means for the arrest and examination of persons charged with a violation of this act; and such commissioners are hereby authorized and required to exercise and discharge all the powers and duties conferred on them by this act, and the same duties with regard to offences created by this act, as they are authorized by law to exercise with regard to other offences against the laws of the United States.

Sec. 5. *And be it further enacted,* That it shall be the duty of all marshals and deputy marshals to obey and execute all warrants and precepts issued under the provisions of this act, when to them directed; and should any marshal or deputy marshal refuse to receive such warrant or other process when tendered, or to use all proper means diligently to execute the same, he shall, on conviction thereof, be fined in the sum of one thousand dollars, to the use of the person upon whom the accused is alleged to have committed the offense. And the better to enable the said commissioners to execute their duties faithfully and efficiently, in conformity with the Constitution of the United States and the requirements of this act, they are hereby authorized and empowered, within their counties respectively, to appoint, in writing, under their hands, any one or more suitable persons, from time to time, to execute all such warrants and other process as may be issued by them in the lawful performance of their respective duties; and the persons so appointed to execute any warrant or process as aforesaid

shall have authority to summon and call to their aid the bystanders or posse comitatus of the proper county, or such portion of the land or naval forces of the United States, or of the militia, as may be necessary to the performance of the duty with which they are charged, and to insure a faithful observance of the clause of the Constitution which prohibits slavery, in conformity with the provisions of this act; and said warrants shall run and be executed by said officers anywhere in the State or Territory within which they are issued.

Sec. 6. *And be it further enacted,* That any person who shall knowingly and willfully obstruct, hinder, or prevent any officer, or other person charged with the execution of any warrant or process issued under the provisions of this act, or any person or persons lawfully assisting him or them, from arresting any person for whose apprehension such warrant or process may have been issued, or shall rescue or attempt to rescue such person from the custody of the officer, other person or persons, or those lawfully assisting as aforesaid, when so arrested pursuant to the authority herein given and declared, or shall aid, abet, or assist any person so arrested as aforesaid, directly or indirectly, to escape from the custody of the officer or other person legally authorized as aforesaid, or shall harbor or conceal any person for whose arrest a warrant or process shall have been issued as aforesaid, so as to prevent his discovery and arrest after notice or knowledge of the fact that a warrant has been issued for the apprehension of such person, shall, for either of said offences, be subject to a fine not exceeding one thousand dollars, and imprisonment not exceeding six months, by indictment and conviction before the district court of the United States for the district in which said offense may have been committed, or before the proper court of criminal jurisdiction, if committed within any one of the organized Territories of the United States.

Sec. 7. *And be it further enacted,* That the district attorneys, the marshals, their deputies, and the clerks of the said district and territorial courts shall be paid for their services the like fees as may be allowed to them for similar services in other cases; and in all cases where the proceedings are before a commissioner, he shall be entitled to a fee of ten dollars in full for his services in each case, inclusive of all services incident to such arrest and examination. The person or persons authorized to execute the process to be issued by such commissioners for the arrest of offenders against the provisions of this act shall be entitled to a fee of five dollars for each person he or they may arrest and take before any such commissioner as aforesaid, with such other fees as may be deemed reasonable by such commissioner for such other additional services as may be necessarily performed by him or them, such as attending at the examination, keeping the prisoner in custody, and providing him with food and lodging during his detention, and until the final determination of such commissioner, and in general for performing such other duties as may be required in the premises; such fees to be made up in conformity with the fees usually charged by the officers of the courts of justice within the proper district or county, as near as may be practicable, and paid out of the Treasury of the United States on the certificate of the judge of the district within which the arrest is made, and to be recoverable from the defendant as part of the judgment in case of conviction.

Sec. 8. *And be it further enacted,* that whenever the President of the

United States shall have reason to believe that offences have been or are likely to be committed against the provisions of this act within any judicial district, it shall be lawful for him, in his discretion, to direct the judge, marshal, and district attorney of such district to attend at such place within the district, and for such time as he may designate, for the purpose of the more speedy arrest and trial of persons charged with a violation of this act; and it shall be the duty of every judge or other officer, when any such requisition shall be received by him, to attend at the place and for the time therein designated.

Sec. 9. *And be it further enacted,* that it shall be lawful for the President of the United States, or such person as he may empower for that purpose, to employ such part of the land or naval forces of the United States, or of the militia, as shall be necessary to prevent the violation and enforce the due execution of this act.

Sec. 10. *And be it further enacted,* That upon all questions of law arising in any cause under the provisions of this act a final appeal may be taken to the Supreme Court of the United States.


SCHUYLER COLFAX,
Speaker of the House of Representatives

LA FAYETTE S. FOSTER,
President of the Senate, *pro tempore.*


*In the Senate of the United States, April 6,* 1866.

The President of the United States having returned to the Senate, in which it originated, the bill entitled "An act to protect all persons in the United States in their civil rights, and furnish the means of their vindication," with his objections thereto, the Senate proceeded, in pursuance of the Constitution, to reconsider the same; and,

*Resolved,* That the said bill do pass, two-thirds of the Senate agreeing to pass the same.

Attest:

J.W. Forney,
Secretary of the Senate.


*In the House of Representatives U.S. April 9th,* 1866.

The House of Representatives having proceeded, in pursuance of the Constitution, to reconsider the bill entitled, "An act to protect all persons in the United States in their civil rights, and furnish the means of their vindication," returned to the Senate by the President of the United States, with his objections, and sent by the Senate to the House of Representatives, with the message of the President returning the bill:

*Resolved,* That the bill do pass, two-thirds of the House of Representatives agreeing to pass the same.

Attest:

Edward McPherson, Clerk,
by Clinton Lloyd, Chief Clerk.

———

# CERTIFICATE OF SERVICE

I, Scott Stern, Pro-Se Plaintiff, in this action of Stern v. Stern, et al United States District Court, docket No 05-30082 MAP, certify that I have caused a copy of the foregoing document:

Objection to US Magistrate Judge Kenneth Neiman recommendation for dismissal

Appendix A-Order of USDC all proceedings to be before MAP not KPN

Appendix B-News Release: Office of the US District Attorney-CA

Appendix C-Berkshire Eagle Woman gets 18 months for Stealing

Appendix D-Man gets 90 days for breaking window

Appendix E-Immunity Broken, Dr. Demosthenes Lorandos

Appendix F-Universal Declaration of Human Rights

Appendix G-United Nations Universal Declaration of Human Rights

Appendix H-The Civil Rights Act of 1866, United States of America

to have been delivered, postage prepaid, to the defendants at their respective addresses on December 5, 2005.

Andrus & Wyllie, P.C.
Erin Wyllie
15 Center Court
Northampton, Massachusetts 01060


The Law Offices of Edward Berlin
Attorney Robert E. Young
278 Main Street, Suite 205
Greenfield, Massachusetts 01301-3302


Long & Holden
100 Summer Street
Boston, Massachusetts 02110

To be delivered, by hand delivery, by the plaintiff, to the
United States District Court, 1550 Main street, Springfield,
Massachusetts on September 28, 2005.

December 5, 2005
_____
Date of Mailing

_____
Signature

Scott Stern
Pro-Se Plaintiff
400 West Main Street
North Adams, Massachusetts 01247